SUMMIT AIRLINES, INC.,
Plaintiff–Appellee,

v.

TEAMSTERS LOCAL UNION NO. 295
and Teamsters Local Union No. 851, af-
filiated with International Brotherhood
of Teamsters, Chauffeurs, Warehouse-
men and Helpers of America; Does I
Through XX, Defendants,

and

Teamsters Local Union No. 851, affiliated
with International Brotherhood of
Teamsters, Chauffeurs, Warehousemen
and Helpers of America; Does I
Through XX, Defendant–Appellant.

No. 433, Docket 79–7538.

United States Court of Appeals,
Second Circuit.

Argued Dec. 10, 1979.

Decided Aug. 11, 1980.

Roland P. Wilder, Jr., Washington, D. C. (Mimi C. Satter, Washington, D. C. and Herbert A. Simon, Valley Stream, N. Y., on brief), for defendant–appellant.

Jefferson D. Kirby, III, Atlanta, Ga. (Ford, Harrison, Sullivan, Lowry & Sykes, Michael H. Campbell, Atlanta, Ga., Anthony J. Cutrona, DiCostanzo & Cutrona, Brooklyn, N. Y., on brief), for plaintiff–appellee.

Scott F. May and John Tucker Morse, Memphis, Tenn. (Cox, May & Thomas, Memphis, Tenn., of counsel), for Federal Express Corp. as amicus curiae.

Michael E. Abram, New York City (Cohen, Weiss & Simon, New York City, of counsel), for Air Line Pilots Ass'n, Intern. as amicus curiae.

Murray Gartner and Edward A. Brill, New York City (Poletti Freidin Prashker, Feldman & Gartner, New York City, of counsel), for Airline Industrial Relations Conference as amicus curiae.

Before FEINBERG, Chief Judge, and LUMBARD and VAN GRAAFEILAND, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

The case presents a novel question under Title I of the Railway Labor Act of 1926 as *amended*, 45 U.S.C. §§ 151–160.[1] It arises from the efforts of Teamsters Local 851 to force Summit Airlines, Inc., to recognize the Teamsters as the bargaining representative of Summit employees who work as cargo handlers at John F. Kennedy International Airport (JFK). Summit refused to extend recognition voluntarily. The question now before us is whether, upon such refusal, the union had to comply with the election and certification procedures of section 2, Ninth of the Act, 45 U.S.C. § 152, Ninth, or whether it was free to ignore section 2, Ninth and attempt to force recognition through picketing and other forms of economic coercion.

Summit Airlines, Inc., is a small all–cargo airline serving twenty–one cities on the East Coast and in the Ohio Valley. It has about two hundred and thirty employees at its twenty–one stations, over ninety of whom are cargo handlers. Before this dispute, Summit had seventeen employees at its JFK station, twelve of whom were cargo handlers. Teamsters Local 851 is an unincorporated labor organization headquartered in Jamaica, New York, which represents cargo handlers in the employ of several freight forwarders and carriers by air doing business at JFK.

In early March of 1979, a group of Summit's JFK employees decided to approach a union. A representative contacted Local 851 and was given a quantity of "authorization cards." The nature of these cards is

---

1. In 1936, coverage of the pertinent portions of the Act was extended to common carriers by air engaged in interstate or foreign commerce. *See* 45 U.S.C. § 181.

disputed. It appears, however, and the district court found, that the employees were told that their signatures on the cards authorized a vote on whether Local 851 would be their collective bargaining representative. Summit's JFK employees signed the cards, and they were returned to Local 851. Discussions between the Union and Summit followed, Summit questioning the reliability of the authorization cards and urging a secret–ballot election conducted by the National Mediation Board, the Union urging voluntary recognition or in the alternative an election under the supervision of an impartial observer such as a school teacher.

In April, Summit's management met with the JFK employees and informed them that the company would not recognize Local 851 as their representative. On April 9th, 17th, 24th, and 30th, Local 851 established a picket line at Summit's JFK facility. On each occasion, the picketing lasted from about 10:00 p. m. until 10:00 a. m., the peak hours for Summit's freight handling operations. The picketers held signs identifying Local 851 and stating that "Summit Airlines Does Not Maintain Area Standards and Conditions of Employment For Ground Personnel." Local 851 officials also contacted a number of Summit's customers and requested that they cease doing business with Summit until the union was recognized. Each of these customers had a collective bargaining agreement with the Teamsters. The district court found that a primary purpose of these activities was to force Summit to recognize Local 851 as the collective bargaining representative of the JFK employees.

The district court also found that the Union's activities had a significant impact on Summit's JFK operations. No cargo was picked up or delivered during the actual picketing. Summit's overall volume of business at JFK was reduced by more than half. Eight of the seventeen JFK employees were laid off, and six airline pilots were furloughed. Several scheduled flights were cancelled.

Summit filed this lawsuit on April 20, 1979, seeking damages for alleged violations of the Railway Labor Act and an injunction against further violations. After hearing Summit's application for a preliminary injunction, the district court held that Local 851 had violated the duty it owed under section 2, First of the Railway Labor Act, 45 U.S.C. § 152, First, to "exert every reasonable effort . . . to settle all disputes . . . in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof." Specifically, Judge Bramwell held that the Union's failure to seek an election conducted by the National Mediation Board under section 2, Ninth was a violation of the duty it owed under section 2, First. The court therefore enjoined the Union from interfering in any way with Summit's JFK operations for the purpose of forcing recognition.

On this appeal from that order, Local 851 does not challenge the district court's findings of fact. Rather, it is the Union's position that Congress did not intend to prohibit recognitional picketing in the circumstances of this case. It argues that, even if the facts are as the district court found, it has violated no command of the Railway Labor Act and therefore the Norris–LaGuardia Act, 29 U.S.C. § 104, prohibits the injunction granted herein.

■ Title I of the Railway Labor Act was adopted in 1926 to replace Title III of the Transportation Act of 1920. The 1926 Act was drafted by a team composed of representatives of both management and labor, and "came on the statute books through agreement between the railroads and the railroad unions . . . ." *International Ass'n of Machinists v. Street*, 367 U.S. 740, 758, 81 S.Ct. 1784, 1794, 6 L.Ed.2d 1141 (1961); *see Chicago & N. W. Ry. v. United Transportation Union*, 402 U.S. 570, 576, 91 S.Ct. 1731, 1735, 29 L.Ed.2d 187 (1971). The draftsmen set forth in section 2, First the general obligation of both the carriers and their employees to attempt in good faith to resolve all disputes without resort to economic coercion:

"It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof."

This duty is "the heart of the Railway Labor Act," *Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 377–78, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344 (1969), and is a legally enforceable obligation, rather than a "mere statement of policy or exhortation," *Chicago & N. W. Ry. v. United Transportation Union, supra*, 402 U.S. at 577, 91 S.Ct. at 1735.

The Act provided separate procedures for the resolution of "major disputes," which involved "changes in rates of pay, rules, or working conditions," and "minor disputes," which included "grievances or . . . interpretation or application" of existing agreements. Railway Labor Act of 1926, ch. 347, § 5, First (a), (b), 44 Stat. 577, 580 (1926).[2] Major disputes were to be resolved through conference (§§ 2, Second, 6), followed, if necessary, by mediation by the newly created United States Board of Mediation (§ 5, First (b)), and, if these steps were unsuccessful, through voluntary arbitration (§ 7). Minor disputes that the parties were unable to adjust in conference (§ 2, Second, Fourth), were to be dealt with by boards of adjustment (§ 3, First), and then, if necessary, through mediation followed by voluntary arbitration (§§ 5, First (a), 7).

■ The Act did not refer explicitly to the resolution of disputes over the recognition of a union as a collective bargaining agent. It merely stated the following general duty concerning designation of representatives:

"Third. Representatives, for the purposes of this Act, shall be designated by the respective parties in such manner as may be provided in their corporate organization or unincorporated association, or by other means of collective action, without interference, influence, or coercion exercised by either party over the self-organization or designation of representatives by the other." Railway Labor Act of 1926, ch. 347, § 2, Third, 44 Stat. 577, 578 (1926).

Local 851 argues from this that recognitional disputes are not brought within the ambit of the Act and that the general duty of section 2, First is therefore inapplicable to them.

After examining the structure, language, and legislative history of the Act, we conclude that this argument must fail. Section 5, First of the Act referred to three separate categories of disputes:

"The parties, or either party, to a dispute between an employee or a group of employees and a carrier may invoke the services of the Board of Mediation created by this Act, or the Board of Mediation may proffer its services, in any of the following cases:

(a) A dispute arising out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions not adjusted by the parties in conference and not decided by the appropriate adjustment board;

(b) A dispute which is not settled in conference between the parties, in respect to changes in rates of pay, rules, or working conditions;

(c) *Any other dispute not decided in conference between the parties.*" Railway Labor Act of 1926, ch. 347, § 5, First, 44 Stat. 577, 580 (1926) (emphasis supplied).

It is apparent from the testimony of Donald R. Richberg, counsel for the railroad employees, that disputes over recognition were

---

**2.** *See Hearings on H.R. 7180 Before the House Comm. on Interstate & Foreign Commerce*, 73d Cong., 2d Sess. 70–71 (1934).

intended to come within section 5, First (c). During the hearings before the House Committee on Interstate and Foreign Commerce, Richberg was asked the following question by Congressman Mapes of Michigan:

> "I do not know that this question is very important, but on pages 8 and 9, section 5, why did you put in subdivisions A and B? Why not say 'any dispute not decided in conference between the parties'?"

Richberg responded:

> "Because we hope to make clear in the law the three types of disputes. It was merely for that purpose. We discussed this and said we could say 'any dispute,' but we did not think it would make it perfectly clear that a dispute over a grievance should never go to the board of mediation until an adjustment board had passed on it. We wanted that clear.
>
> The second thing, we wanted it clear that a dispute over a change of agreement did not go to an adjustment board; that an adjustment board had nothing to do whatsoever with changes in the agreement, but that if the parties could not agree on changes in conference, then the Government mediation came immediately upon the ground. *Then we wanted to make it clear that there were other kinds of disagreements, such as, for example,* a disagreement over the establishment of an adjustment board, a disagreement over the original agreement before any agreement was made, *a disagreement over the original representation.* All those types of disputes are not specifically covered in A and B, and so to have a catchall we put in C any other disputes. The reason is for clarification of the intent of the law. It would all be comprehended, as a matter of fact, in the words 'any disputes.' " *Hearings on H.R. 7180 Before the House Comm. on Interstate & Foreign Commerce,* 69th Cong., 1st Sess. 70–71 (1926); (emphasis supplied); *accord, id.* at 43–44.

■ Because Mr. Richberg represented one of the groups which drafted the provisions of this statute, his statements are entitled to great weight in its construction. *Chicago & N.W. Ry. v. United Transportation Union, supra,* 402 U.S. at 576, 91 S.Ct. at 1735. Moreover, the Board of Mediation did in fact handle disputes over recognition under the 1926 Act, sometimes even conducting elections. *See Virginian Ry. v. System Federation No. 40,* 300 U.S. 515, 546 n. 5, 57 S.Ct. 592, 599 n. 5, 81 L.Ed. 789 (1937); *Hearings on H.R. 7650 Before the House Comm. on Interstate & Foreign Commerce,* 73d Cong., 1st Sess. 28, 78 (1934). It appears, therefore, that although recognitional disputes were not foremost among the problems Congress sought to remedy, *see, e. g., Hearings on H.R. 7180, supra,* at 12, they were nonetheless considered to be disputes within the meaning of the Act. The general section 2, First duty therefore applied to them. That duty extended then, as now, to *"all disputes,* whether arising out of the application of such [collective bargaining] agreements or otherwise . . . ." (Emphasis supplied).

The 1926 Act was a significant step forward in the resolution of labor problems in the railroad industry. *See Hearings on H.R. 7650 Before the House Comm. on Interstate & Foreign Commerce,* 73d Cong., 2d Sess. 16 (1934). However, it proved ineffective in dealing with both minor disputes and disputes over representation. Accordingly, in 1934 the Federal Coordinator of Transportation, Joseph B. Eastman, proposed a number of amendments. *See* Subcomm. on Labor of the Senate Comm. on Labor & Public Welfare, *Legislative History of the Railway Labor Act as Amended* 954 (1974).

Section 2, Third of the 1926 Act provided that each party's representative should be designated without interference, influence, or coercion by the other party. Although this provision stated "a noble purpose, [it did not prove] to be self–enforcing, and the act provided no other means of enforcement. Consequently the purpose was not accomplished." *Hearings on H.R. 7650, supra* at 22 (testimony of Coordinator Eastman). *The lack of an effective mechanism*

for resolving disputes over representation allowed the carriers to maintain company unions, supported by management and susceptible to management's influence. *See id.* at 23–24. In addition, the Act provided no effective means of resolving "the jurisdictional question that often arises as to whether one organization or another organization is the proper one to represent a particular group of employees." *Id.* at 40.

Congress enacted section 2, Ninth of the Act in 1934 to resolve these controversial representation questions. Section 2, Ninth created "[m]achinery . . . for the taking of a secret ballot to enable the Board of Mediation to determine what representatives the employees desire to have negotiate for them . . . ." H.R.Rep.No. 1944, 73d Cong., 2d Sess. 2 (1934). The new provision was as follows:

"Ninth. If any dispute shall arise among a carrier's employees as to who are the representatives of such employees designated and authorized in accordance with requirements of this Act, it shall be the duty of the Mediation Board, upon request of either party to the dispute, to investigate such dispute and to certify to both parties, in writing, within thirty days after the receipt of the invocation of its services, the name or names of the individuals or organizations that have been designated and authorized to represent the employees involved in the dispute, and certify the same to the carrier. Upon receipt of such certification the carrier shall treat with the representative so certified as the representative of the craft or class for the purposes of this Act. In such an investigation, the Mediation Board shall be authorized to take a secret ballot of the employees involved, or to utilize any other appropriate method of ascertaining the names of their duly designated and authorized representatives in such manner as shall insure the choice of representatives by the employees without interference, influence, or coercion exercised by the carrier. In the conduct of any election for the purposes herein indicated the Board shall designate who may participate in the election and establish

the rules to govern the election, or may appoint a committee of three neutral persons who after hearing shall within ten days designate the employees who may participate in the election. The Board shall have access to and have power to make copies of the books and records of the carriers to obtain and utilize such information as may be deemed necessary by it to carry out the purposes and provisions of this paragraph."

In addition, section 2, Third was amended to proscribe clearly the maintenance of company unions under the influence of management. 45 U.S.C. § 152, Third.

The 1926 Act's mechanism for resolution of minor disputes had also proved to be ineffective. *Hearings on H.R. 7650, supra,* at 45–49. Although the Act provided that boards of adjustment "shall be created by agreement" to resolve these disputes, there was nothing in the Act that compelled disputants to agree to the creation of these boards. As a result, few were created. And because minor disputes had to be dealt with by boards of adjustment before the Board of Mediation could intervene, § 5, First (a), the failure to establish boards of adjustment prevented intervention by the Board of Mediation. In addition, the Act provided that the two sides were to be equally represented on the boards. § 3, First (f). Not surprisingly, this provision resulted in numerous deadlocks.

Congress' solution to these problems was the establishment of a plan for arbitration of minor disputes. The National Railroad Adjustment Board was created, and provision was made for the appointment of a neutral member to resolve deadlocks. Either party could refer the dispute to the Board, and the Board's awards were made "final and binding upon both parties . . ." § 3, First (i), (*l*), (m); *see Hearings on H.R. 7650, supra,* at 45–49.

In *Brotherhood of Railroad Trainmen v. Chicago River & I. R. R.,* 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957), which involved a work stoppage over minor disputes that were pending before the Adjustment

Board, the Court held that arbitration of minor disputes under section 3, First is compulsory. 353 U.S. at 39, 77 S.Ct. at 639. The analogous question in the case at hand is whether section 2, Ninth affords the sole and mandatory means for resolving disputes over representation. The parties argue, and this Court agrees, that the Supreme Court's *Chicago River* decision marks the path for our inquiry.

Section 3, First, after creating the National Railroad Adjustment Board, provides that disputes growing out of grievances or the interpretation of application of agreements concerning pay, rules, or working conditions "may be referred by petition of the parties or by either party" to the Board. The Board's awards are to be final and binding on both parties except insofar as they contain an award of money. 45 U.S.C. § 153, First (i), (m). The *Chicago River* Court found the language of the statute to be "unequivocal," stating:

"Awards of this Board are 'final and binding upon both parties.' And either side may submit the dispute to the Board. The Brotherhood suggests that we read the Act to mean only that an Adjustment Board has been organized and that the parties are free to make use of its procedures if they wish to; but that there is no compulsion on either side to allow the Board to settle a dispute if an alternative remedy, such as resort to economic duress, seems more desirable. Such an interpretation would render meaningless those provisions in the Act which allow *one* side to submit a dispute to the Board, whose decision shall be final and binding on *both* sides. If the Brotherhood is correct, the Adjustment Board could act only if the union and the carrier were amenable to its doing so. The language of § 3, First, reads otherwise and should be literally applied in the absence of a clear showing of a contrary or qualified intention of Congress." 353 U.S. at 34–35, 77 S.Ct. at 637 (footnote omitted).

■ The language of section 2, Ninth strongly resembles that of section 3. Either side to a dispute may refer the dispute to the National Mediation Board. The decision of the Board is binding, and the carrier's obligation to treat with the certified representative is mandatory, exclusive, and judicially enforceable. *Virginian Ry. v. System Federation No. 40, supra,* 300 U.S. at 547–49, 57 S.Ct. at 599–600.[3] The difficulty in the instant litigation arises out of the fact that the carrier does not have a "side" in a dispute over representation and therefore cannot invoke the services of the Board under this section. *Brotherhood of Railway Clerks v. Association for the Benefit of Non–contract Employees,* 380 U.S. 650, 666, 85 S.Ct. 1192, 1200, 14 L.Ed.2d 133 (1965).

■ The Union argues that if Congress had wished to make recourse to the Board compulsory, it would have allowed carriers access to the Board as it did in section 3. Although this argument is not illogical, there is little basis for concluding that it reflects Congressional intent. The Su-

---

**3.** A threshold question of course is whether there is a "dispute . . . among a carrier's employees" within the meaning of section 2, Ninth. We think there is. The scheme of the Act contemplates carrier–wide organization, *see* section 2, Fourth, and the NMB usually has required organization to be carrier–wide. *Switchmen's Union v. NMB,* 135 F.2d 785, 794 (D.C.Cir.), *rev'd on other grounds,* 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61 (1943). Moreover, the NMB deems the dispute requirement of section 2, Ninth satisfied even though only one union seeks representation if some employees are indifferent or hostile to being represented by that union or by any other union. *See Fortieth Annual Report of the National Mediation Board* (1974), at 30; *Air Florida, Inc.,* 7

NMB No. 89 (1979). Because it is apparent that Local 851 does not represent the majority of a class or craft of Summit's employees, and even its representation of craft employees at JFK is in question, the requirement of a dispute is met, and its resolution is for the National Mediation Board. *International Association of Machinists and Aerospace Workers v. Northeast Airlines, Inc.,* 536 F.2d 975, 977 (1st Cir.), *cert. denied,* 429 U.S. 961, 97 S.Ct. 387, 50 L.Ed.2d 328 (1976); *International Association of Machinists and Aerospace Workers v. Compagnie Nationale Air France,* 433 F.Supp. 1087, 1091–92 (S.D.N.Y.), *aff'd without opinion,* 573 F.2d 1291 (2d Cir. 1977), *cert. denied,* 439 U.S. 818, 99 S.Ct. 79, 58 L.Ed.2d 108 (1978).

preme Court has held that carriers are not necessary parties before the Board in representation disputes simply because "it is the employees' representative that is being chosen, not the carriers'." *Brotherhood of Railway Clerks v. Association for the Benefit of Non–Contract Employees, supra,* 380 U.S. at 666, 85 S.Ct. at 1201. There is nothing in the language or legislative history of the Act to indicate that the exclusion of carriers from representation proceedings under section 2, Ninth reflects a Congressional intent to make those proceedings optional. Indeed, a logical argument can be made that because the Union's power to invoke the statutory process is exclusive, there is a greater obligation to exercise that power.

In *Chicago River,* the Supreme Court found strong support in the legislative history for its conclusion that arbitration under section 3 is compulsory. The Court concluded "that there was a general understanding between both the supporters and the opponents of the 1934 amendment that the provisions dealing with the Adjustment Board were to be considered as compulsory arbitration in this limited field." 353 U.S. at 39, 77 S.Ct. at 640. The legislative history of section 2, Ninth is more equivocal. We have found no explicit indication that Congress intended to make resort to section 2, Ninth optional, nor any explicit indication to the contrary.

Summit directs our attention to a 1934 letter from Coordinator Eastman to President Roosevelt that reads in part:

"The Coordinator has drafted amendments to the Railway Labor Act designed to clear up ambiguities therein, provide definite means of representation of employees with penalties to insure management from interference in the election of representatives, and provide for compulsory adjustment of individual grievances. These amendments are set out in principle in the Senate Bill S. 3266. The House Bill, H.R. 9689, has some changes. The differences are not too great for a prospect of harmonizing them in conference.

If the proposed amendments are not enacted so as to provide an orderly system of elections under the auspices of the United States Board of Mediation to decide the issue of representation, a host of strike threats and other labor difficulties will arise this summer, demanding Presidential intervention. Similar difficulties are also likely to result because of the unavailability of adequate grievance–adjustment machinery as proposed by the amendments." Letter from Coordinator Eastman to President Roosevelt (June 14, 1934, *reprinted in Legislative History of the Railway Labor Act, supra,* at 954).

Summit also points to statements found elsewhere in the legislative history which describe in similar terms the function of elections under section 2, Ninth and the role of section 3 in resolving minor disputes. These passages afford only indirect support for the argument that Congress intended to make resort to section 2, Ninth mandatory.

Local 851, for its part, points to what it regards as significant differences in the legislative histories of the two sections. For example, unlike section 3, section 2, Ninth was not opposed by the Teamsters as setting up a compulsory mechanism for the resolution of disputes. *See Hearings on H.R. 7650, supra,* at 116–19. The Union also observes that Coordinator Eastman described the two sections at various times in differing terms. However, these are not persuasive indicia that Congress intended resort to the section 2, Ninth machinery to be optional.

In these circumstances, the Court must rely upon the language of the statute and the dominant statutory purpose. Unlike the National Labor Relations Act, *see, e. g., NLRB v. Drivers Local No. 639,* 362 U.S. 274, 284, 80 S.Ct. 706, 712, 4 L.Ed.2d 710 (1960); 29 U.S.C. § 163, the Railway Labor Act is specifically designed and intended "[t]o avoid any interruption to commerce or to the operation of any carrier engaged therein . . . ." 45 U.S.C. § 151a. All parties are charged with an enforceable obligation "to exert every reasonable effort . . . to settle all disputes . . . in order to avoid any interruption to com-

merce or to the operation of any carrier . . . ." 45 U.S.C. § 152, First. As the *Chicago River* Court said with regard to section 3, First, a holding that a union may ignore the section 2, Ninth procedure and resort instead to economic coercion would render the procedure "meaningless." *See* 353 U.S. at 34, 77 S.Ct. at 637.

Local 851's reluctance to invoke the services of the National Mediation Board in this case is understandable. The Board's long-standing practice, in keeping with its statutory mandate, is to certify only unions that represent the majority of a system–wide class of employees. *Burlington Northern, Inc. v. American Ry. Supervisors Ass'n,* 503 F.2d 58, 62 (7th Cir. 1974), *cert. denied,* 421 U.S. 975, 95 S.Ct. 1974, 44 L.Ed.2d 466 (1975); *Galveston Wharves,* 4 NMB Determ. 200, 203 (No. R–3493, March 1, 1962); *see Hearings on H.R. 7650, supra,* at 33, 44, 57, 89. Local 851 seeks to represent only the twelve cargo handlers who work at JFK.

 The Union argues that, notwithstanding the Board's interpretation of its statutory mandate, Summit could recognize the Union voluntarily as the representative of the JFK employees. *See, e. g., Burlington Northern, Inc. v. American Ry. Supervisors Ass'n, supra,* 503 F.2d at 63; *Ruby v. American Airlines, Inc.,* 323 F.2d 248, 254 (2d Cir. 1963) (Friendly, J.), *cert. denied,* 376 U.S. 913, 84 S.Ct. 658, 11 L.Ed.2d 611 (1964); *Galveston Wharves, supra,* at 203. It does not follow, however, that because Summit could recognize Local 851 voluntarily, the Union may, upon Summit's refusal to do so, ignore section 2, Ninth and resort directly to economic coercion. The legislative history reflects a preference for class–wide representation. *See Hearings on H.R. 7650, supra,* at 33, 44, 57, 89. If unions seeking to represent less than a class–wide majority are free to strike and picket instead of resorting to section 2, Ninth, the

same privilege must be accorded unions seeking class–wide certification. If Local 851 can ignore the statutory procedure, then a union seeking to represent a class–wide majority may do the same. Such a result would indeed make section 2, Ninth a nullity. We conclude that Congress did not intend that resort to the mechanism of section 2, Ninth be optional in either case.

*Pan American World Airways, Inc. v. International Bhd. of Teamsters,* 275 F.Supp. 986 (S.D.N.Y.1967), *aff'd sub nom. Brotherhood of Railway Clerks v. Pan American World Airways, Inc.,* 404 F.3d 938 (2d Cir. 1969), supports the conclusion we reach herein. In *Pan American,* two unions struggled to achieve Board certification as the bargaining representative of Pan American's 8,000 clerical and related employees. While the dispute was pending before the Board under section 2, Ninth, one of the unions called a work stoppage with a view to forcing the airline to extend recognition. The district court held that an injunction against the work stoppage would lie to vindicate the processes of the Railway Labor Act, and this Court affirmed. Admittedly, *Pan American* differs from the case at hand in that *Pan American* involved a matter pending before the Board. The affront to section 2, Ninth, however, is the same whether or not the statutory process has already been invoked.[4]

 . Because Local 851 has violated a positive command of the Railway Labor Act, the Norris–LaGuardia Act does not bar the issuance of an injunction. *Brotherhood of Railroad Trainmen v. Chicago River & I. R. R., supra,* 353 U.S. at 41, 77 S.Ct. at 640; *Virginian Ry. v. System Federation No. 40, supra,* 300 U.S. at 563, 57 S.Ct. at 606.

Affirmed.

---

**4.** *Pan American* is not to be distinguished on the ground that the dispute in that case involved rival unions, whereas in the present dispute only one union seeks recognition. The National Mediation Board regularly processes representation cases involving only one union.

In those cases, the "dispute" is between employees who favor having a representative and those who are either indifferent or opposed. *Fortieth Annual Report of the National Mediation Board, supra,* at 30. .