**EASTERN AIR LINES, INC., Plaintiff,**

v.

**AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, Henry Duffy, Eastern Master Executive Counsel, John J. Bavis, Jr., John Doe, and Jane Doe, Defendants.**

No. 89–0446–CIV.

United States District Court,
S.D. Florida.

April 11, 1989.

---

David L. Ross and Alan H. Rolnick of Greenberg, Traurig, Hoffman, Lipoff, Rosen & Quentel, P.A., Miami, Fla., and David P. Callet of Akin, Gump, Strauss, Hauer & Feld, Washington, D.C., for plaintiff Eastern.

James L. Linsey, Richard Gilberg and Robert Salvison of Cohen, Weiss & Simon, New York City, Robert T. Kofman of Stearns, Weaver, Miller, Weissler, Alhadeff & Sitterson, P.A., Miami, Fla., and Gary Green of Air Line Pilots Ass'n, Intern., Legal Dept., Washington, D.C., for defendants ALPA.

## FINDINGS OF FACT

EDWARD B. DAVIS, District Judge.

THIS MATTER is before this Court after remand by the Eleventh Circuit Court of Appeals.

### BACKGROUND

On March 4, 1989, the International Association of Machinists & Aerospace Workers, AFL–CIO ("IAM") began a strike against EASTERN AIR LINES, INC. ("EASTERN"). On that same day, the AIR LINE PILOTS ASSOCIATION, INTERNATIONAL ("ALPA"), by unanimous resolution of its Master Executive Council, advised its pilots to engage in a sympathy strike with the IAM and to refuse to cross IAM picket lines. According to ALPA, well over ninety percent of its members participated in the strike and some even joined IAM picket lines. The legality of the IAM strike is undisputed, since the IAM has fully exhausted the dispute resolution mechanisms of the Railway Labor Act, 45 U.S.C. §§ 151–188 (1982) ("RLA"), and since the National Mediation Board released EASTERN and the IAM from mediation on February 1, 1989.[1] It is also undisputed that ALPA, which began formal contract negotiations with EASTERN by exchanging notices pursuant to Section 6 of the RLA, 45 U.S.C. § 156 (1982), on May 31, 1988, has not exhausted RLA procedures.

Plaintiff EASTERN filed this action to enjoin ALPA from engaging in a labor strike without exhausting the resolution mechanisms mandated under the RLA, arguing in essence that the pilots were engaged in a pretextual primary strike barred by the status quo provisions of the RLA. Alternatively, EASTERN argued that, even if ALPA was engaged in a pure sympathy strike, ALPA's activities were enjoinable pending exhaustion of the RLA's minor dispute resolution mechanisms.[2] On March 6, 1989, EASTERN moved for a temporary restraining order enjoining ALPA from participating in the IAM strike. EASTERN later moved for a permanent injunction.

On March 8, 1989, this Court entered its Order denying EASTERN's Motions. This Court ruled that the Norris–LaGuardia Act, interpreted in light of its surrounding historical perspective, dispels a district court of jurisdiction, absent a valid no-strike clause in the labor agreement, to compel a union and its members to cross co-workers' lawful picket lines. Accordingly, this Court declined to make any factual determination as to whether ALPA's strike is a pure sympathy strike, or whether ALPA's sympathy claim is merely a pretext for

---

1. The IAM observed the requisite thirty-day cooling off period before beginning its strike on March 4, 1989.

2. The Eleventh Circuit Court of Appeals has since ruled in this case that EASTERN and ALPA are engaged in a major, rather than minor, dispute within the meaning of the RLA. *Eastern Air Lines v. Air Line Pilots Association,* No. 89–5229 (11th Cir. Mar. 24, 1989) (order of limited remand).

ALPA's own self-help.[3] Upon EASTERN's appeal, the Eleventh Circuit Court of Appeals vacated this Court's Order and remanded the case "for the limited purpose of conducting further proceedings to make findings of fact on the pretext issue." The Eleventh Circuit held that, even though it is ordinarily lawful to honor other unions' picket lines and even though the RLA does not unambiguously prohibit sympathy strikes, a claim of sympathy strike cannot be used as a pretext to shield what would otherwise be a clear violation of the RLA. *Eastern Air Lines v. Air Line Pilots Association*, No. 89–5229 (11th Cir. Mar. 24, 1989) (order of limited remand).

## DISCUSSION

Two legislative enactments control the instant dispute. The Norris–LaGuardia Act, 29 U.S.C. §§ 101–115 (1982 & Supp. IV 1986), enacted to take "federal courts out of the labor injunction business,"[4] prohibits courts of the United States from issuing "any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in strict conformity with the provisions of [the Act]." 29 U.S.C. § 101 (1982). The Railway Labor Act, 45 U.S.C. §§ 151–188 (1982), also enacted to promote non-judicial resolution of labor disputes,[5] provides specific dispute resolution mechanisms which must be employed before management or labor may engage in self-help. The RLA originally applied to "any express company, sleeping-car company, carrier by railroad ... and any company which is directly or indirectly owned or controlled by [any such company]." 45 U.S.C. § 151 (1982). In 1936, the Act was expanded to apply to carriers by air. 45 U.S.C. § 181 (1982). Injunctive relief is proper under the Railway Labor Act to prohibit premature self-help in a major dispute between management and union. *Chicago & N.W. Railway v. United Transportation Union*, 402 U.S. 570, 582–83 & n. 17, 91 S.Ct. 1731, 1737–38 & n. 17, 29 L.Ed.2d 187 (1971). Both the Railway Labor Act and the Norris–LaGuardia Act were enacted to promote compelling public interests. Any factual determination in this case must be made in light of the legislative intent behind each Act.

The Norris–LaGuardia Act arose out of the need to prevent overactive courts from interfering in labor-management disputes,[6] and from undermining the ability of labor groups to effectively negotiate labor contracts. *See United Steelworkers of America v. United States*, 361 U.S. 39, 80 S.Ct. 1, 4 L.Ed.2d 12 (1959) (Douglas, J., dissenting). Prior to its enactment, "[f]reewheeling Attorneys General used compelling public demands to obtain the help of courts in stilling the protests of labor. The revulsion against that practice was deep, and it led ultimately to the enactment of the Norris–LaGuardia Act...." *Id.* at 67, 80 S.Ct. at 7. The Act itself sets forth the public policy to be considered in interpreting its provisions:

> Whereas under prevailing economic conditions, developed with the aid of governmental authority for owners of property to organize in the corporate and other forms of ownership association, the individual unorganized worker is commonly helpless to exercise actual liberty of contract and to protect his freedom of labor,

---

**3.** This Court reasoned that inquiry into the minds and motives of the pilots is just the sort of judicial intrusion which the Norris–LaGuardia Act, as consistently applied by the Supreme Court over the last thirty years, was enacted to prevent.

**4.** "The (Act's) language is broad because Congress was intent upon taking the federal courts out of the labor injunction business except in the very limited circumstances left open for federal jurisdiction under the Norris–LaGuardia Act." *Burlington Northern Railroad Co. v. Brotherhood of Maintenance of Way Employes*, 481 U.S. 429, 107 S.Ct. 1841, 1849, 95 L.Ed.2d 381 (1987) (quoting *Marine Cooks & Stewards v. Panama Steamship Co.*, 362 U.S. 365, 369, 80 S.Ct. 779, 783, 4 L.Ed.2d 797 (1960)).

**5.** *Brotherhood of Railroad Trainmen v. Toledo P & W Railroad*, 321 U.S. 50, 58, 64 S.Ct. 413, 418, 88 L.Ed. 534 (1944).

**6.** "Injunctions in labor disputes, which were tyrannical, which were an insult to American and Anglo–Saxon principles of liberty and justice, have at last so aroused the sense of justice of the American people that there is a demand for this bill to-day." 75 Cong.Rec. 5499 (1932).

and thereby to obtain acceptable terms and conditions of employment, wherefore, though he should be free to decline to associate with his fellows, it is necessary that he have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection; therefore, the following definitions of and limitations upon the jurisdiction and authority of the courts of the United States are enacted.

29 U.S.C. § 102 (1982). Giving effect to the aforementioned concerns, the Act specifically provides that courts of the United States shall not have jurisdiction to enjoin any person from:

(a) Ceasing or refusing to perform any work or to remain in any relation of employment;

(b) Becoming or remaining a member of any labor organization or of any employer organization, regardless of any such undertaking or promise as is described in section 103 of this title;

(c) Paying or giving to, or withholding from, any person participating or interested in such labor dispute, any strike or unemployment benefits or insurance, or other moneys or things of value;

(d) By all lawful means aiding any person participating or interested in any labor dispute who is being proceeded against in, or is prosecuting, any action or suit in any court of the United States or of any State;

(e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence;

(f) Assembling peaceably to act or to organize to act in promotion of their interests in a labor dispute;

(g) Advising or notifying any person of an intention to do any of the acts heretofore specified;

(h) Agreeing with other persons to do or not to do any of the acts heretofore specified; and

(i) Advising, urging, or otherwise causing or inducing without fraud or violence the acts heretofore specified, regardless of any such undertaking or promise as is described in section 103 of this title.

29 U.S.C. § 104 (1982).

The Act's language was decidedly unambiguous, in order that an unequivocal message of noninterference would be imparted to a judiciary which had ignored the more delicate dictate of the Clayton Act. "The underlying aim of the Norris–LaGuardia Act was to restore the broad purpose which Congress thought it had formulated in the Clayton Act but which was frustrated, so Congress believed, by unduly restrictive judicial construction." *United States v. Hutcheson*, 312 U.S. 219, 235–36, 61 S.Ct. 463, 467–68, 85 L.Ed. 788 (1941). As stressed by the House Committee "[t]he purpose of the bill is to protect the rights of labor in the same manner the Congress intended when it enacted the Clayton Act ... which act, by reason of its construction and application by the Federal courts, is ineffectual to accomplish the congressional intent." H.R.Rep. No. 669, 72d Cong., 1st Sess. 3 (1932). Given the failure of the Clayton Act to protect labor groups from overactive pro-management courts, and the need for a more definitive prohibition on the judiciary, legislators declined to write exceptions into the Act, even "where the welfare, health, or lives of a public are concerned who are not parties to such labor dispute, or where a labor dispute involves the obstruction of any instrumentality of interstate or foreign commerce." 75 Cong. Rec. 5503 (1932). This amendment, proposed by Representative Beck, was condemned by the House sponsor of the Bill and was ultimately rejected.

Several Supreme Court interpretations of the Norris–LaGuardia Act highlight the congressional intent behind one of the most severe legislative restrictions placed on the

judiciary to date. Of fundamental importance in these decisions is the insulation of the principles, motives, and objectives of union activity from scrutiny by an "ill-suited" judiciary. "[T]he licit and the illicit ... are not to be distinguished by any judgment regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means." *United States v. Hutcheson*, 312 U.S. 219, 232, 61 S.Ct. 463, 466, 85 L.Ed. 788 (1941). This type of purpose-motive approach was again rejected by the Supreme Court in order to prevent judicial notions of the social and economic desirability of union action from governing antitrust liability. *United Mine Workers of America v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). In the most recent pronouncement in this regard, the United States Supreme Court, by unanimous decision, reaffirmed this basic tenet by rejecting a "substantial-alignment test" and refusing to allow judicial second-guessing of union means and motives. *Burlington Northern Railroad Co. v. Brotherhood of Maintenance of Way Employes*, 481 U.S. 429, 107 S.Ct. 1841, 1849, 95 L.Ed.2d 381 (1987). Thus, both the legislative intent motivating the promulgation of the Norris–LaGuardia Act and thirty-some-odd years

of Supreme Court interpretation culminating in *Burlington Northern*, unambiguously denounce judicial inquiry as to the means, motives and propriety of concerted union activity.

The other Act establishing the framework within which a factual determination must be made in this case is the Railway Labor Act, 45 U.S.C. §§ 151–188 (1982). Like the Norris–LaGuardia Act, the RLA was enacted to advance a compelling public interest—the protection of interstate commerce.[7] To achieve this end, the RLA seeks to maintain the status quo in a labor-management dispute for as long as possible before allowing a disruption of interstate commerce through self-help by either party. The RLA further provides specific dispute resolution mechanisms which must be employed in labor disputes involving carriers in interstate commerce. These procedures—including arbitration, mediation and possible action by a Presidential Emergency Board—are mandatory and must be exhausted before either party to the dispute may engage in self-help. *Brotherhood of Railroad Trainmen v. Jacksonville Bulk Terminal Co.*, 394 U.S. 369, 378, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344 (1969).[8]

Central to the RLA's purpose is the preservation of the status quo in the labor-

---

7. The RLA "is specifically designed and intended '[t]o avoid any interruption to commerce or to the operation of any carrier engaged therein....'" *Summit Airlines, Inc. v. Teamsters Local Union No. 295*, 628 F.2d 787, 794 (2d Cir. 1980). The Act's statement of general purposes sets forth its principal objectives:

The purposes of the chapter are: (1) To avoid any interruption to commerce or to the operation of any carrier engaged therein; (2) to forbid any limitation upon freedom of association among employees or any denial, as a condition of employment or otherwise, of the right of employees to join a labor organization; (3) to provide for the complete independence of carriers and of employees in the matter of self-organization to carry out the purposes of this chapter; (4) to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions; (5) to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions.

45 U.S.C. § 151a (1982).

8. The Supreme Court described the detailed statutory framework for resolving major disputes in *Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 378, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344 (1969):

A party desiring to effect a change of rates of pay, rules or working conditions must give advance written notice. § 6. The parties must confer, § 2 Second, and if conference fails to resolve the dispute, either or both may invoke the services of the National Mediation Board, which may also proffer its services *sua sponte* if it finds a labor emergency to exist. § 5 First. If mediation fails, the Board must endeavor to induce the parties to submit the controversy to binding arbitration which can take place, however, only if both consent. §§ 5 First, 7. If arbitration is rejected and the dispute threatens "substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service, the Mediation Board shall notify the President," who may create an emergency board to investigate and report on the dispute. § 10.

management dispute. Throughout the Act's "almost interminable" process for dispute resolution, *Detroit & Toledo Shore Line Railroad v. United Transportation Union*, 396 U.S. 142, 149, 90 S.Ct. 294, 299, 24 L.Ed.2d 325 (1969), "neither party may unilaterally alter the status quo." *Brotherhood of Railroad Trainmen*, 394 U.S. at 378, 89 S.Ct. at 1115. Moreover, even after the Act's procedures are concluded and the parties released by the National Mediation Board, Section 5, First, of the RLA requires the parties to maintain the status quo, and therefor to refrain from engaging in self-help, for an additional thirty days. 45 U.S.C. § 156 (1982). As such, the Act's status quo requirement, as a means to allow for collective bargaining while at the same time protecting the flow of interstate commerce, is central to the Act's design. *Detroit & Toledo Shore Line Railroad v. United Transportation Union*, 396 U.S. 142, 150, 90 S.Ct. 294, 299, 24 L.Ed.2d 325 (1969).

Since the purposes of these two Acts seemingly conflict, we first note that the Norris–LaGuardia Act was promulgated with the RLA already in existence.[9] Also, legislative history shows that the "over-all policy of the Norris–LaGuardia Act [and the RLA] was the same."[10] Both Acts promote the free association of union groups and both favor the resolution of labor disputes through non-judicial means. This unity of purpose is especially clear in the Norris–LaGuardia Act's "clean hands" provision, 29 U.S.C. § 108 (1982), which disallows the issuance of an injunction in favor of any party "who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration." *See id.* The foregoing purposes in mind, courts quickly came to the conclusion that the broad and outspoken policy of the Nor-

ris–LaGuardia Act could give way to the previously enacted Railway Labor Act only in unambiguous situations. *Burlington Northern Railroad Co. v. Brotherhood of Maintenance of Way Employes*, 481 U.S. 429, 107 S.Ct. 1841, 1851, 95 L.Ed.2d 381 (1987) (The RLA's exception to the Norris–LaGuardia Act "is necessarily a limited one."). The foregoing policies in mind, this Court now addresses the facts of this case.

## FINDINGS OF FACT

In addressing the question presented this Court by the Eleventh Circuit—whether ALPA's claimed sympathy strike is a mere pretext for its own self-help—any factual determination must take into consideration the aforementioned legislative intent and must recognize that only a clear factual situation (one which minimizes judicial intrusion into assessment of the beneficiality and motives of concerted labor activity) can give rise to an exception to the Norris–LaGuardia Act. In its remand to this Court, the Eleventh Circuit suggested the degree of clarity of evidence required in order to fit an exception to the Norris–LaGuardia Act's prohibition, when it instructed that "[u]nambiguous violations of the RLA can be enjoined in federal court." *Eastern Air Lines v. Air Line Pilots Association*, No. 89–5229 (11th Cir. Mar. 24, 1989) (order of limited remand). To employ anything other than this strict standard, or to rule as to the predominant purpose of ALPA's actions and inquire, where unclear, into the minds of the pilots or its union organizers, would come near to the freewheeling judicial activity which the Clayton Act and the more explicit Norris–LaGuardia Act specifically guard against. With these concerns in mind, and after taking evidence at two hearings and reviewing hundreds of pages of exhibits and pleadings, this Court makes

9. "The Norris–LaGuardia Act was adopted March 23, 1932.... At that time the Railway Labor Act of 1926 was in force.... Though it differed in substantial respect from the [current] Railway Labor Act ... it contained provisions for the three procedures of negotiation, mediation and arbitration ..." *Brotherhood of Railroad Trainmen v. Toledo P & W Railroad*, 321 U.S. 50, 57 n. 12, 64 S.Ct. 413, 417 n. 12, 88 L.Ed. 534 (1944).

10. *Brotherhood of Railroad Trainmen v. Toledo P & W Railroad*, 321 U.S. 50, 58, 64 S.Ct. 413, 417, 88 L.Ed. 534 (1944).

its findings of fact.[11]

Evidence from a variety of sources tends to support EASTERN's contention that ALPA's claimed sympathy strike was a mere pretext for its own self-help in violation of the RLA. A primary subject of the present ALPA negotiations was the preservation of EASTERN's physical assets and routes and the prevention of further down-sizing of the airline through a "fence agreement."[12] Mr. Douglas Levy, an EASTERN Pilot and ALPA member, testified that Pilot Bruce Cushing (erroneously transcribed as "Kurick," *see* Tr. II at 204) stated that failure to achieve the fence agreement was the reason for the strike:

Q: Can you describe for the Court what Mr. Kurick said to you?

A: Well, he wanted to know why I had flown the airplane or why I was going to fly an Eastern airplane after the strike, and I told him that I didn't view ALPA's decision to go out as a reason—I didn't want to support the IAM in the strike. I viewed this action as supporting the IAM.

He retorted—my conversation with him, "We are not supporting the IAM. This is an issue of—between ALPA and the company. *We are striking against the company because we want a fence agreement, we want a contract.*"

Tr. I at 68 (Levy) (emphasis added). The testimony of Captain John Bavis, Chairman of ALPA's Master Executive Council ("MEC") further supports EASTERN's claim. Mr. Bavis indicated that the MEC[13] voted to engage in a sympathy strike because, *inter alia*, ALPA could not attain a fence agreement. Tr. II at 147–152 (Bavis); Plaintiff's Exhibit GG. Captain Bavis also testified: "When it became completely obvious that ... the airline won't guarantee that there would not be continual down-sizing, a sale of assets [away from] Eastern Air Lines, that there would not be a future for any of us at Eastern, [the MEC] voted unanimously to support in sympathy with the IAM." Tr. I at 81 (Bavis).

Large scale communications by ALPA to its members also tend to support EASTERN's claim of pretext. Plaintiff's Exhibit T, a letter from MEC Member Michael Donovan to Council 72 Pilots, states that the IAM March 4 strike deadline "offers an opportunity for us to exact a negotiated agreement, incorporating the necessary job security and economic provisions we consider essential ...," and indicates that one of ALPA's motives for engaging in the sympathy strike was the attainment of contract goals presently under RLA section 6 negotiation. More dramatically, a videotape prepared by ALPA's Eastern Pilots' Communication Network contains bold statements by ALPA representatives urging ALPA members to support the IAM picket lines. In this tape, Mr. Farrell Kupersmith states, "the primary reason that ALPA will have honored an IAM picket line is because the company was unwilling to grant job security provisions in a contract with ALPA." Mr. Kupersmith further proclaims, "the only reason that we would not cross a picket line, among others, is because we were unable to obtain an acceptable contract out of the remaining time

---

11. This Court has reviewed EASTERN's Objections to Defendants' Proposed Exhibits (as supplemented) and ALPA's response thereto. While this Court considers many of the exhibits in question to be of limited probative value, the documents are admitted into evidence for the purposes of this proceeding.

12. In their negotiations, ALPA sought an agreement that would, *inter alia*, prevent EASTERN from further down-sizing the airline. Tr. I at 83–84 (Bavis). Thomas Matthews, EASTERN's Senior Vice–President of Human Resources, testified that the pilots' principal demands under their section 6 negotiations with EASTERN regarded job security. ALPA specifically demanded (1) a "fence agreement" to insure that East-

ern would not dispose of assets and international routes; (2) that EASTERN would maintain a specified number of Captain positions and keep the Eastern pilot seniority list separate from that of Continental Air Lines; and (3) that Texas Air Corporation would agree to honor the fence agreement. Tr. II at 13–14 (Matthews). Jack Bavis also testified that one of the foci of the section 6 negotiations was the attainment of a fence agreement. Tr. II at 147 (Bavis). *See also* Tr. II at 53–57 (Duffy).

13. Under ALPA policy, the decision whether to engage in strike activity is made by ALPA's Master Executive Council ("MEC") and the President of ALPA. [Tr. 49 (Duffy) ].

available before the IAM cooling-off period expires." Plaintiff's Exhibit J at 13, 14 (Kupersmith) (transcription of videotape). *See also* Tr. II at 38–45 (Kupersmith, Bavis) (excerpts of videotape); Tr. II at 124, 145, 154–55 (Bavis). *See generally*, Plaintiff's Exhibits B–E, & K–U. However, this Court recognizes that such representations were motivated in part by a desire to distill ALPA members' dislike for the IAM, and may not accurately and entirely reflect ALPA's motivations.

Finally, a showing of past ALPA animosity towards the IAM stemming back to the IAM's 1986 decision not to honor its agreement to accept wage reductions similar to those taken by ALPA pilots makes a claim that ALPA acted out of concern for brother and sister workers less plausible than it might otherwise be. Tr. II at 17–18 (Matthews); Tr. II at 137–38 (Bavis); Tr. II at 182–83 (Cushing); Woolfolk Dep. at 17–18; McMullen Dep. at 109.

While the above evidence illustrates that one of ALPA's motives in joining the IAM strike may have been to enhance its bargaining position with regard to current contract negotiations, other facts prove that ALPA instructed its members to strike for reasons unrelated to current section 6 negotiations. The totality of the evidence in this case shows that ALPA and its Master Executive Council instructed ALPA pilots to join the IAM strike for a multiplicity of reasons. *See* Defendant's Exhibit 1B. Plaintiff relies heavily upon a document titled, "Suggested Reasons for Possible MEC Decision to Honor IAM Picket Line," to show that ALPA acted to advance its position on the section 6 bargaining table. Plaintiff's Exhibit D. Even this document shows that MEC motivation occurred for a variety of reasons, including failure to secure a fence agreement, safety concerns, dislike for EASTERN Chairman, Frank Lorenzo, and general long-term concern for the survival of EASTERN. Additional evidence bolsters the showing that ALPA instructed its pilots to engage in a sympathy strike out of a perceived need for the two employee groups to work together for their mutual benefit. Defendant's Exhibit 15; Defendant's Exhibit 30. The MEC advised its members that a purpose of the strike was to "support our brothers and sisters of the IAM," Defendant's Exhibit 34, and join together to fight a common enemy. Defendant's Exhibits 23, 24, 25.

Another fact proven at trial suggests that ALPA may have joined in the IAM strike even if it had reached an agreement with EASTERN. On March 2, 1989, ALPA made a formal proposal to Eastern containing (1) a fence agreement embodying job security provisions; (2) a Texas Air Corporation letter of agreement containing desired guarantees from Texas Air; and (3) amendments to the 1986 basic collective bargaining agreement. Plaintiff's Exhibit GG. The proposal was not accepted. Tr. II at 28 (Matthews). ALPA's proposal did not include any provision for the continuation of work in the event of an IAM strike. Tr. II at 32–35 (Matthews); Tr. II at 120–22 (Bavis). Moreover, Thomas Matthews, EASTERN's Senior Vice–President of Human Resources, a witness this Court finds credible, admitted that he had never been told by Bavis that picket lines would be crossed even if EASTERN agreed to all of the demands made in ALPA's May 2 proposal. Thus, it was likely that ALPA intended to engage in a sympathy strike with the IAM even if EASTERN accepted its proposal.

Much evidence was introduced which suggests that ALPA's distrust for Frank Lorenzo and EASTERN management was a *substantial* factor motivating the decision to join the IAM strike. *See, e.g.,* Woolfolk Dep. at 11–12; Tr. II at 195 (Cushing); Tr. II at 50–57, 63–68 (Duffy). Jack Bavis, Chairman of ALPA's Master Executive Council ("MEC"), testified that the MEC voted for the pilots to join the IAM strike because the pilots had been disappointed in their hope "that there was going to be a change in the management attitude, and that the process that had taken place since Eastern Air Lines was purchased by Mr. Lorenzo back in 1986 would [change]." Tr. I at 81 (Bavis). This evidence is particularly telling in that even if ALPA would have secured an agreement, ALPA representatives believed EASTERN management

would have "nitpicked" and otherwise not fully honored any agreement that might have been reached. The pilots' overwhelming distrust of the Lorenzo management group, whether founded or not, is the keynote of this labor dispute. With this as their central concern, it is likely that ALPA would have joined the IAM strike, even if EASTERN had conceded to their section 6 demands.

Bolstering this conclusion is the fact that EASTERN failed to take advantage of several possible solutions to the IAM dispute which would have helped maintain the status quo of the concurrent ALPA–EASTERN relationship as required under the "clean hands" provision of the Norris–LaGuardia Act. 29 U.S.C. § 108 (1982). First, ALPA supported binding arbitration of the IAM–EASTERN dispute while EASTERN opposed it. Second, ALPA backed IAM support for the National Mediation Board's recommendation that President Bush form a Presidential Emergency Board to facilitate settlement of the IAM–EASTERN dispute. EASTERN opposed the recommendation. Tr. II 57–60 (Duffy); Tr. 112–13 (Bavis). Finally, EASTERN opposed, and ALPA supported, special legislation which would have maintained the status quo in the EASTERN–IAM dispute and which thereby would have addressed ALPA's concerns regarding job stability and the continued viability of EASTERN. These failures by EASTERN to promote a resolution of the IAM dispute bolster ALPA's claim that it joined the IAM strike primarily out of distrust and disapproval of the Lorenzo management group and out of long-term concern for the airline.

In interpreting the voluminous evidence presented, this Court first notes that several factors motivated ALPA and its Master Executive Council to instruct the pilots to join the IAM strike. Since the bulk of these motives go beyond current contract negotiations, the evidence does not reveal an "unambiguous" violation of the Railway Labor Act. It may be noted that many of the motives presented by both sides involve the self-interest of ALPA and its members. However, those familiar with labor negotiations are readily aware that every sympathy strike is motivated by the self-interest of the secondary union's members. Judge Learned Hand long ago explained:

> When all the other workmen in a shop make common cause with a fellow workman over his separate grievance, and go out on strike in his support, they engage in a "concerted activity" for "mutual aid or protection," although the aggrieved workman is the only one of them who has any immediate stake in the outcome. The rest know that by their action each one of them assures himself, in case his turn ever comes, of the support of the one whom they are all then helping; and the solidarity so established is "mutual aid" in the most literal sense, as nobody doubts. So too of those engaging in a "sympathetic strike," or secondary boycott; *the immediate quarrel does not itself concern them, but by extending the number of those who will make the enemy of one the enemy of all, the power of each is vastly increased.*

*National Labor Relations Board v. Peter Cailler Kohler Swiss Chocolates Co.,* 130 F.2d 503, 505–06 (2d Cir.1942) (emphasis added); *see also Brotherhood of Railroad Trainmen v. Atlantic Coast Line Railroad Company,* 362 F.2d 649, 654 & n. 5 (5th Cir.), *aff'd,* 385 U.S. 20, 87 S.Ct. 226, 17 L.Ed.2d 20 (1966).[14]

The evidence which EASTERN most heavily relies upon consists of large-scale communications to its member pilots. These communications were undoubtedly intended to distill past animosity towards the IAM, and as such do not likely reflect the full panoply of factors motivating the MEC's decision. For this reason, this Court does not accord this type of evidence great weight.

In light of the evidence discussed above, one conclusion which cannot reasonably be disputed is that ALPA's decision to join the IAM strike was motivated by various factors. One major factor—a factor which goes far beyond current section 6 negotia-

---

**14.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), the Eleventh Circuit adopted as binding all decisions of the former Fifth Circuit handed down before the close of business on September 30, 1981.

tions—was ALPA's overwhelming distrust for the Lorenzo management group. More convincing than the voluminous evidence which was presented, however, is the lack of evidence presented on another key issue in this case. Despite the hundreds of pages of argument, transcripts and exhibits, there is no evidence that the pilots had any plan to strike or would have struck EASTERN at any time if the IAM had settled or if the IAM had not gone on strike. Tr. II 122 (Bavis); McMullen Dep. 223–35; Gibson Dep. 17–18; Defendant's Exhibit 41. In the volumes of evidence presented to this Court, there is not one scintilla of evidence that ALPA was even *contemplating* an illegal primary strike during their own negotiations, as long as the status quo was maintained in the machinist's dispute. *See Eastern Air Lines v. Flight Engineers International Association,* 340 F.2d 104 (5th Cir.) (mediation board procedures not exhausted during a major dispute is not itself sufficient to enjoin strike), *cert. denied,* 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 59 (1965).

For the foregoing reasons, this Court finds that EASTERN has not met its burden of proving a substantial likelihood[15] that ALPA would not have honored the IAM picket lines but for current ALPA–EASTERN negotiations. Nor has EASTERN proven that ALPA's predominant motive for directing its members to honor IAM picket lines was to achieve a new ALPA contract through a pilots' strike.[16] As such, the Court finds that ALPA's action was not "unambiguously" a "pretext" for self-help.

DONE AND ORDERED.

[15.] A party seeking preliminary injunctive relief must make four showings:
(1) a substantial likelihood that [the movant] will ultimately prevail on the merits; (2) that [the movant] will suffer irreparable harm; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party, and (4) that if issued, the injunction would not be adverse to the public interest.

*Baker v. Buckeye Cellulose Corp.,* 856 F.2d 167, 169 (11th Cir.1988).

[16.] Additionally, in light of the evidence of unclean hands on the part of EASTERN in failing to take every reasonable effort to settle the related IAM strike, this Court would decline to evoke its equitable powers in EASTERN's favor.