**RAILWAY LABOR EXECUTIVES'
ASSOCIATION, et al., Plaintiffs,**

v.

**WHEELING ACQUISITION
CORP., Defendant,**

**Norfolk and Western Railway
Co., Intervenor.**

**Civ. A. No. 90–597–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

May 15, 1990.

John O'B Clarke, Jr. and David J. Strom,
Highsaw, Mahoney & Clarke, P.C., Washington, D.C., for plaintiffs.

Timothy A. Harr and Robert H. Wheeler,
Oppenheimer Wolff & Donnelly, Washington, D.C., for Wheeling Acquisition Corp.

Jeffrey S. Berlin and Mark E. Martin,
Richardson, Berlin & Morvillo, Washington,
D.C., for Norfolk and Western Ry. Co.

MEMORANDUM OPINION

ELLIS, District Judge.

*Introduction*

This unusual labor dispute [1] comes before the Court on plaintiffs' Application for a Temporary Restraining Order ("TRO") and defendant's Motion to Dismiss Count I

---

**1.** Under the Norris–LaGuardia Act,

[t]he term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee.

29 U.S.C. § 113(c).

of the Complaint. The novel and central question presented is whether a company is a "carrier" under the Railway Labor Act ("RLA" or "the Act"), 45 U.S.C. § 151 *et seq.*, where it has contracted to purchase several hundred miles of rail lines and facilities, but does not currently own any rail lines or provide any rail services. A related question is whether persons hired by this company qualify as "employees" under the RLA. If these questions are answered in the affirmative, then defendant is subject to the full panoply of the RLA's bargaining duties and obligations, which, in turn, are the bases of plaintiffs' TRO Application. If such a company is not a "carrier," then the fundamental premise of plaintiffs' TRO Application fails and the Application, together with Count I of the Complaint, must be dismissed.

### Facts

Plaintiffs are ten rail labor unions and the Railway Labor Executives' Association ("RLEA"), an unincorporated association of seventeen union chief executive officers. Defendant, Wheeling Acquisition Corporation ("Wheeling"), is a Delaware corporation that has contracted to purchase certain rail lines from the intervenor, Norfolk and Western Railway Company ("N & W"). All N & W employees, except those represented by Brotherhood of Locomotive Engineers ("BLE") and United Transportation Union ("UTU")[2], are represented for collective bargaining by the ten plaintiff unions in this matter.

Wheeling currently owns no rail lines, nor does it provide any railroad transportation services. This will soon change. As a result of a December 22, 1989 asset purchase agreement, Wheeling will shortly acquire approximately 575 miles of rail lines.

The transaction includes Wheeling's acquisition from N & W of all the lines of the former Akron, Canton & Youngstown Railroad and Pittsburgh & West Virginia Railway, and most of the lines of the former Wheeling & Lake Erie Railroad. Under the agreement, Wheeling will also obtain trackage rights to an additional 264 miles of rail lines. At present, it appears that the transaction may be consummated as early as Thursday, May 17, 1990.

At the heart of this dispute is plaintiffs' demand that Wheeling bargain with plaintiff unions over the manner and method of hiring employees for the new railroad. It is important, therefore, to set out the facts relating to Wheeling's hiring activities. The proper starting point here is the purchase agreement. Section 16.1 of that agreement provides, in essence, that Wheeling will be solely and exclusively responsible for hiring its new employees and setting the terms and conditions of employment, and that nothing in the purchase agreement binds Wheeling to any existing N & W collective bargaining agreement.[3] Although not bound to do so, Wheeling went on in Section 16.1 to express its intention to give preference in hiring to the approximately 400 employees currently active on the lines being acquired.[4]

> In hiring new employees, Buyer [Wheeling] intends to offer employment opportunities first to current employees of Seller or its affiliated or subsidiary carriers who are active in rail operations being conducted with the Assets to be transferred. Offers will be based on qualifications of the said current employees, as solely determined by buyer, for the positions available.

> conduct with the Assets being purchased. Nothing herein shall be construed to require Buyer to accept any terms or conditions of any collective bargaining agreement to which Seller, or any of its affiliated or subsidiary carriers, may be a party. Buyer shall be solely and exclusively responsible for establishing the terms and conditions of employment."

**2.** N & W and BLE reached a settlement with respect to certain issues involved in the instant dispute, resulting in BLE's absence from this litigation. And, for reasons not in the record, UTU is not a party to this action.

**3.** Asset Purchase Agreement, § 16.1 states, in pertinent part,

"Buyer shall have full responsibility for the hiring of a work force, sufficient in its judgment, to conduct the rail business it intends to

**4.** These employees are hereafter collectively referred to as the "N & W employees."

Section 16.1 also states that Wheeling is permitted to recruit the N & W employees.[5]

In its first year of operation, Wheeling expects to employ a total work force of over 380 people, including approximately 50 management and supervisory personnel and approximately 330 nonmanagement employees. Thus, Wheeling began its implementation of Section 16.1 in early March 1990 by inviting the N & W employees to apply for jobs with Wheeling. These N & W employees were also invited to attend informational meetings in various convenient venues to learn more about the plans and objectives of the new company, the hiring process and career opportunities. Interested persons not employed by N & W were also invited to attend. Wheeling estimates that about 300 people attended the meetings in four locations. In early April, Wheeling sent a second letter to eligible N & W employees who had not yet applied for jobs. In that letter Wheeling stated:

> Before filling the roster [*i.e.*, hiring employees], we wish to make one last attempt to provide the opportunity for first consideration to those currently working on the lines, including yourself. If you are interested in applying, we would like to talk with you. If we do not hear from you by April 19, we will conclude that you are not interested in employment, and we will seek to fill any remaining vacancies with others who have applied for employment. Your opportunity to receive first consideration in hiring will expire after April 19.

As a result of its recruiting efforts, Wheeling has received over 500 job applications or expressions of interest. Of that number, 239 N & W employees ultimately participated in the interview and testing process at Wheeling. This process included certain job related tests. For example,

candidates for maintenance-of-way positions were asked to carry, with the assistance of a second candidate, a standard 175-pound railway cross tie a distance of 75 feet. Candidates for train and engine were asked to carry a 75-pound "knuckle" the same distance. All N & W employees who took these tests passed. But not all candidates who were asked to demonstrate other job-related skills were as successful. For example, some secretarial applicants had to demonstrate typing proficiency of 40 words per minute. Some candidates did not pass this and other job-related tests. Those who failed were given an opportunity to improve their skills and retake the tests. Subsequent to the interviews and skills evaluations, candidates underwent physical examinations at Wheeling's expense. Less than 5% of the candidates failed the physical examination. To date, it appears that Wheeling has offered jobs to approximately 192 [6] N & W employees. Wheeling, however, does not require that N & W employees resign from N & W as a condition of employment with Wheeling. Thus, employees may retain the option of being recalled to employment by N & W at any time, despite their employment with Wheeling.

Although Wheeling is giving hiring preference to N & W employees, it has not agreed to hire existing N & W employees in seniority order by craft. According to Wheeling, this decision stems from the differences between N & W's rail operations and Wheeling's planned operations. N & W operates the lines to be acquired as spur lines. Wheeling, by contrast, will operate the lines as a wholly separate rail system. Accordingly, Wheeling will have different operating patterns, service standards, crews, and seniority systems. Job categories will be different, reflecting the differ-

---

**5.** "Seller agrees that Buyer may solicit employees of Seller or its subsidiary or affiliated carriers who are involved in such rail operations. Buyer may solicit employees of Seller or its subsidiary or affiliated carriers who are involved in such rail operations. Buyer agrees that with respect to each such employee offered employment with Buyer but who refuses such employment, Buyer will notify Seller in writing of its offer of employment, the position offered

and the place of employment and rate of pay, including fringe benefits."

**6.** This figure, the most recent available to the Court, is taken from the Supplemental Verified Statement of James W. Hanscom submitted in connection with *Wheeling Acquisition Corporation—Exemption, Acquisition and Operation,* ICC No. 31591 (April 30, 1990). The final figure will likely be higher.

ent needs and structure of the new Wheeling system. As a result, Wheeling will utilize its personnel differently from N & W's practice. In many cases, positions on the Wheeling line will be functionally different from existing positions on the N & W line. Also, Wheeling's current plans for restoration of the Canton–Cleveland line will require the employment of more personnel than N & W currently uses.

Plaintiffs' two count Complaint seeks declaratory and injunctive relief. In Count I, plaintiffs request the Court to declare that (i) defendant Wheeling must bargain with each union whose members will be affected by the proposed transfers, and that (ii) defendant Wheeling violated Section 2 First of the RLA by refusing to negotiate with rail labor unions over the manner in which N & W employees will be selected and assigned. Further, plaintiffs request that the Court enjoin defendant Wheeling from hiring any N & W employees until it has reached an agreement with rail labor unions over the manner in which Wheeling will select, hire and assign its employees.

Count II is in the alternative. Should the Court rule that the RLA does not impose on Wheeling any obligation to bargain and confer with plaintiffs, Count II requests that the Court declare that plaintiffs are not prohibited by any law of the United States from "[c]easing or refusing to perform any work or to remain in any relation of employment; ... [g]iving publicity to the existence of ... any labor dispute, whether by advertising, speaking, patrolling ... [or] urging" as provided in Sections 4(a), (e), and (i) of the Norris LaGuardia Act, 29 U.S.C. § 104(a), (e), and (i). As plaintiffs' application for a TRO and defendant's Motion to Dismiss Count I are the only matters presently before the Court, the Court need only consider Count I.

Simply stated, Wheeling's position[7] is that it is not yet a "carrier" under the RLA, and therefore, not yet subject to its bargaining scheme. Moreover, Wheeling argues that the RLA confers no rights on plaintiff unions with respect to Wheeling, because the statute guarantees to Wheel-

ing's future employees the right to select their own representatives and, therefore, these unions cannot claim to represent the future employees. According to Wheeling, the right to represent these employees must be won through the normal RLA process. This Court, in Wheeling's view, cannot confer on these unions the ability to assert claims on behalf of Wheeling's future work force because, under the RLA, the National Mediation Board ("NMB") has exclusive jurisdiction over questions of representation. Wheeling has therefore moved to dismiss Count I as failing to state a claim under the RLA.

Two related proceedings merit mention here. The first is an action filed by the current plaintiffs, plus the UTU, in August, 1989. *Railway Labor Executives' Ass'n, et al. v. Chesapeake Western Railway, et al.*, Civil Action No. 89–1157A (E.D.Va. 1989). In that action, plaintiffs sued Chesapeake Western Railway, Norfolk Southern Corporation, Norfolk and Western Railway Company, and Southern Railway Company to enjoin the railroads' sale, lease, and abandonment of various of the railroads' spur lines. Plaintiffs alleged that defendants violated their duties under the RLA (i) to exert every reasonable effort to settle all disputes, maintain agreements and bargain only with designated employee representatives; (ii) to give written notice to bargain with its employees' representatives regarding defendants' decision to enter into intra-corporate leases and trackage rights agreements; and (iii) to comply fully with RLA bargaining and status quo obligations triggered by Section 6 notices when defendants discontinued operations, and implemented lease transactions and trackage rights agreements. On February 16, 1990, this Court considered cross-motions for summary judgment and ruled that plaintiffs' suit raised a "minor dispute" under the RLA. *See Consolidated Rail Corp. v. Railway Labor Executives' Ass'n ("Conrail")*, —— U.S. ——, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989); *Dement v. Richmond, Fredericksburg & Potomac R.R.*, 845 F.2d 451 (4th Cir.1988). Accordingly, noting it

---

**7.** N & W, the intervenor, echoes Wheeling's position and arguments.

lacked jurisdiction to hear minor disputes, the Court directed the parties to proceed to mandatory arbitration pursuant to their collective bargaining agreement.[8] *See Conrail,* 109 S.Ct. 2477 (1989); *Andrews v. Louisville & Nashville R.R.,* 406 U.S. 320, 92 S.Ct. 1562, 32 L.Ed.2d 95 (1972). Arbitration proceedings are currently ongoing.[9] As an alternative basis for not exercising its jurisdiction over the proposed transactions, the Court also concluded that the Interstate Commerce Commission (the "ICC") has exclusive jurisdiction over transactions authorized and conducted pursuant to 49 U.S.C. § 11343. *Cf. Brotherhood of Locomotive Eng'rs v. Boston & Maine Corp.,* 788 F.2d 794 (1st Cir.) (ICC approval of a transaction pursuant to 49 U.S.C. § 10505 displaces the RLA), *cert. denied,* 479 U.S. 829, 107 S.Ct. 111, 93 L.Ed.2d 59 (1986); *Brotherhood of Locomotive Eng'rs v. Chicago & North Western Ry.,* 314 F.2d 424 (8th Cir.) (ICC approval of a transaction under 49 U.S.C. § 11347 displaces the RLA), *cert. denied,* 375 U.S. 819, 84 S.Ct. 55, 11 L.Ed.2d 53 (1963). Finally, the Court held in abeyance defendants' request for an injunction to prevent plaintiffs from striking over the minor dispute. Appropriate orders issued reflecting these rulings and a memorandum opinion is forthcoming.

The second related proceeding grows out of the transaction at issue in the case at bar. It is an ICC proceeding in which RLEA and United Transportation Union ("UTU"), two of the instant plaintiffs, attempted to block the sale transaction to Wheeling by seeking ICC revocation of a previously effective regulatory exemption. The Interstate Commerce Act, 49 U.S.C. § 10901, ordinarily requires entities seeking to acquire and operate existing rail lines to obtain prior ICC approval. By regulation, the ICC has granted an exemption from this prior approval requirement to entities organized to provide transportation by rail carrier. *See* 49 C.F.R. § 1150.1(a). Soon after signing the purchase agreement, Wheeling invoked this exemption, which became effective on February 2, 1990. Thereafter, on April 6, 1990, the RLEA and the UTU filed a petition with the ICC seeking revocation of the exemption, a stay of the Wheeling transaction, and the imposition of interim employee protective conditions. On May 7, 1990, the ICC denied the requested relief, concluding that (i) petitioners did not have a strong likelihood of prevailing on the merits; (ii) petitioners would not be irreparably harmed in the absence of a stay; (iii) issuance of a stay would substantially harm other parties; and (iv) issuance of a stay is not in the public interest[10]. *Railway Labor Executives' Ass'n v. Wheeling Acquisition Corp.,* ICC No. 31591 (April 30, 1990).

*Analysis*

1. *Standard for TRO Relief*

 The proper analysis to be used in determining propriety in granting interlocutory injunctive relief is well settled in this Circuit. *See Blackwelder Furniture Co. of Statesville v. Seilig Mfg. Co., Inc.,* 550 F.2d 189 (4th Cir.1977). *See also Dan River, Inc. v. Icahn,* 701 F.2d 278, 283 (4th Cir.1983); *North Carolina State Ports Authority v. Dart Containerline, Ltd.,* 592 F.2d 749, 750 (4th Cir.1979). The first step of that analysis requires the Court to balance the likelihood of irreparable harm to plaintiff without the TRO, against the harm to the defendant with the TRO. If this balance of harm tips in plaintiff's favor, then plaintiff is entitled to relief provided he raises "serious questions" on the

---

**8.** *Railway Labor Executives Ass'n v. Chesapeake Western Railway,* Civil No. 89–1157A (memorandum opinion issued June 13, 1990).

**9.** Not until May 2, 1990 did plaintiffs initiate the arbitration process by seeking a special Board of Adjustment under § 3, Second of the RLA. Defendants there claim that plaintiffs' submitted issues are not arbitrable. The matter is now before the NMB.

**10.** Notably, the factors the ICC evaluated are identical to the factors this Court must examine in evaluating plaintiffs' request for a TRO. *See eg. Blackwelder Furniture Co. of Statesville v. Seilig Mfg. Co., Inc.,* 550 F.2d 189 (4th Cir.1977). *See also Dan River, Inc. v. Icahn,* 701 F.2d 278, 283 (4th Cir.1983); *North Carolina State Ports Auth. v. Dart Containerline, Ltd.,* 592 F.2d 749, 750 (4th Cir.1979).

merits. *Blackwelder*, 550 F.2d at 195. But if plaintiff fails to prevail on the balance of harms tests, then no injunctive relief should issue unless plaintiff demonstrates a likelihood of success on the merits. Finally, the Court must consider whether the public's interest is served by issuing or withholding injunctive relief.

As noted above, the TRO analysis ordinarily begins with an assessment of the balance of harms. Here, however, analysis more appropriately begins with the merits of Count I because Wheeling's dismissal motion is dispositive of that count.

### 2. *The Merits*

■ By its own terms, the RLA's bargaining duties apply only to "carriers, their officers, agents and employees." *Railway Labor Executives' Ass'n v. Interstate Commerce Comm'n*, 859 F.2d 996 (D.C. Cir.1988). The RLA defines "carrier" by reference to the Interstate Commerce Act ("ICA" or "the Act"). Section 1 of the RLA provides:

> The term "carrier" includes any ... carrier by railroad, subject to the Interstate Commerce Act ...

45 U.S.C. § 151, First. Thus, whether the Act applies here depends upon whether the ICA definition of "carrier" covers Wheeling. The ICA defines "carrier" as "a person providing railroad transportation for compensation." 49 U.S.C. § 10102(19).[11] The present tense is significant; for purposes of the ICA and RLA, a carrier is one who currently provides railroad transportation for compensation. Wheeling does not fall within this definition. This interpretation is entirely consistent with the ICC's construction of the term "carrier." Illustrative of this is the ICC's decision in *United Transport. Union v. Bessemer & Lake Erie Co. & P & C*, 342 I.C.C. 849 (1974). There, the ICC made clear that "carrier" excludes entities who do not currently provide rail service even though their organizational purpose is to do so.

To be a carrier, P & C must be engaged in transportation. This test includes the common law concept of "holding out" to transport the property or person of anyone who might elect to use the service. This is an objective test and depends not upon the corporate charter or declared purposes, but rather on what the company does.

342 I.C.C. 849, 855 (1974) (citations omitted.) Thus, the ICC confirms that Wheeling is not a carrier within the meaning of the RLA.

Plaintiffs make several arguments in seeking to avoid this result. None succeeds. First, plaintiffs argue that the maxim of statutory construction *"ejusdem generis* [12]" warrants the conclusion that the ICA definition of "carrier" is not exclusive and includes defendants here. This argument is unpersuasive. Where general words follow enumerations of particular classes or things, *"ejusdem generis"* dictates that the general words be construed as applicable only to the classes or things of the same general nature or kind as those enumerated. *See Lexington County Hosp. v. Schweiker*, 740 F.2d 287, 290 (4th Cir.1984). Thus, if the definition of carrier enumerated various types of entities, followed by general terms, the maxim would apply to elucidate the meaning of the general terms. The ICA definition of "carrier" is not one comprised of general words following specific enumerations such that its meaning is left open to expansion. Instead, the definition is more aptly viewed using as a lens the rule *"expressio unius est exclusio alterius.*[13]" Thus, if Congress did not include entities like Wheeling in the definition of "carrier," then it intended not to do so.

Plaintiffs further argue that, despite the plain language of the RLA and the ICA, Wheeling's invocation of an ICC class ex-

---

**11.** Arriving at this definition is a two-step process. First, the ICA defines a "carrier" as a "common carrier," which is thereafter defined as a "rail carrier." *See* 49 U.S.C. §§ 10102(2), 10102(4).

**12.** "Of the same kind, class or nature." *Black's Law Dictionary* 464 (5th ed. 1979).

**13.** "[T]he expression of one thing is the exclusion of another." *Black's Law Dictionary* 521 (5th ed. 1979).

emption for line acquisitions under ICA § 10901 and its issuance of securities pursuant to ICA § 11301, transformed Wheeling into a carrier. This argument is without merit. These provisions govern transactions involving *non-carrier* activities, including line acquisition and securities issuance. That a specific transaction involving a non-carrier requires ICA compliance does not convert a non-carrier into a carrier. The plain language of these provisions recognizes the non-carrier status of the entities to which they apply. ICA § 10901, the class exemption provision, states that *"noncarriers* require Commission approval under Section 10901 to ... acquire or operate a rail line in interstate commerce." 49 C.F.R. § 1150.1(a) (emphasis added); *See also Ex Parte No. 392 (Sub–No 1), Class Exemption for the Acquisition and Operation of Rail Lines under 49 U.S.C. 10901,* 1 I.C.C. 2nd, 810 (1985), *aff'd sub nom., Illinois Commerce Comm'n v. Interstate Commerce Comm'n,* 817 F.2d 145 (D.C. Cir.1987). Federal courts of appeals decisions also reflect that ICA § 10901 applies to non-carriers seeking to acquire rail lines. *See Black v. Interstate Commerce Comm'n,* 762 F.2d 106, 111, 114–15 (D.C. Cir.1985) (acquisition of rail line by non-carrier is governed by § 10901); *Railway Labor Executives Ass'n v. United States,* 697 F.2d 285, 286 (10th Cir.1983); *In re Chicago, Milwaukee, St. Paul and Pacific R.R.,* 658 F.2d 1149, 1169 (7th Cir.), *cert. denied,* 455 U.S. 1000, 102 S.Ct. 1632, 71 L.Ed.2d 867 (1982). Nothing in ICA § 10901's language suggests that its invocation converts non-carriers into carriers. To become a carrier, the entity must meet the criteria of a "rail carrier" as described under ICA § 10102(20); it must currently be providing rail service. Wheeling does not yet meet that definition.

Equally meritless is plaintiffs' argument that the ICA's requirement of ICC approval of securities issuance somehow converts Wheeling into a "carrier." While ICA § 11301 expands the general definition of "carrier" to include a "corporation organized to provide transportation by rail carrier," it does so *solely* for the purposes of that section. It states,

> *"In this section*—(1) 'carrier' means a rail ... carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission ... and a corporation organized to provide transportation by rail carrier ..."

49 U.S.C. § 11301(a)(1) (emphasis added). Thus, entities so defined also must obtain prior ICC approval for the issuance of securities. *See* 49 U.S.C. § 11301(b)(1). This expanded definition is nowhere else used with respect to the imposition of carrier duties on non-carriers. Plaintiffs have not offered, nor has the Court found, any authority supporting plaintiffs' proposed expansion of this definition beyond § 11301. Thus, the Court concludes that Congress' explicit inclusion of non-carriers solely for purposes of § 11301 is no authority for the proposition that Wheeling is a rail carrier subject to the full panoply of RLA bargaining duties and obligations.

Even assuming, *arguendo,* that Wheeling is a "carrier," plaintiffs' claim still fails. Simply put, Wheeling currently has no "employees" that could subject it to the RLA's bargaining requirements. And, it is well settled that employment applicants are not "employees" under the RLA. Section 1, Fifth provides:

> The term "employee" as used herein includes every person in the service of a carrier ... who performs any work defined as that of an employee.

45 U.S.C. § 151, Fifth. Again, the use of the present tense is significant and dispositive. RLA rights are conferred only on "employees" of a "carrier" who currently perform work for that carrier. *Nelson v. Piedmont Aviation, Inc.,* 750 F.2d 1234 (4th Cir.), *cert. denied,* 471 U.S. 1116, 105 S.Ct. 2358, 86 L.Ed.2d 259 (1985); *Airline Pilots Ass'n Internat'l v. United Air Lines, Inc.,* 802 F.2d 886 (7th Cir.1986). Applicants for employment, even to a carrier, are not "employees" with RLA rights under Section 1, First and Fifth. Judge Wilkinson put it succinctly,

> Nothing in the statutory language or the legislative history of the Railway Labor Act ... supports [the] contention that applicants for employment are covered.

The purpose of the statute is to establish the mechanics for collective bargaining between interstate carriers and their employees through freely selected representative of both parties ... Here the statutory language does not admit of doubt. At the time of his application to Piedmont, appellant was not "in the service of a carrier" and did not "perform any work" for an airline as specified by 45 U.S.C. Section 151 Fifth.

*Piedmont*, 750 F.2d at 1236. In short, even were Wheeling a "carrier," it has no "employees" that could subject it to the RLA's bargaining duties.

Finally, plaintiffs suggest that the omission of entities like Wheeling from the RLA's definition of "carrier" is a legislative oversight; they invite the Court to remedy this judicially by applying the *Fall River* doctrine to the RLA context.[14] The Court declines this invitation, as indeed the ICC declined it in *Railway Labor Executives' Ass'n v. Wheeling Acquisition Corp.*, ICC No. 31591 (April 30, 1990). Courts should be chary of importing National Labor Relations Act doctrines into the RLA. As the ICC noted,

> the duty to bargain and rules governing rail labor relations are controlled by the Railway Labor Act. The [ICC] is not authorized to act in the place of the National Labor Relations Board.

*Railway Labor Executives' Ass'n v. Wheeling Acquisition Corp.*, ICC No. 31591 (April 30, 1990) (slip op. at 2). Nor can the Court accept plaintiffs' invitation to fill the putative gap left by Congress by judicial fiat. Filling the putative gap plaintiffs assert exists here requires such an exercise in the weighing of policy considerations as to make unmistakably clear that it is a legislative, not a judicial, task. Moreover, the relief plaintiffs seek arguably conflicts with the RLA with respect to the manner of designating employee representatives for new entities. Ordinarily, employees are free to choose their representatives free from carrier interference or

influence. In the event a dispute arises, applicable case law establishes that disputes concerning employee representation are neither "major" nor "minor" disputes under the RLA, but rather are a third category of dispute called "representational." *Independent Union of Flight Attendants v. Pan American World Airways, Inc.*, 664 F.Supp. 156, 158 (S.D.N.Y.), *aff'd*, 836 F.2d 130 (2d Cir.1980). These disputes are committed exclusively to the jurisdiction of the National Mediation Board. *See Airline Pilots Ass'n International v. Texas Internat'l Airlines, Inc.*, 656 F.2d 16 (2d Cir.1981); *Summit Airlines v. Teamsters Local Union No. 295*, 628 F.2d 787 (2d Cir.1980); *Aircraft Mechanics Fraternal Ass'n v. United Airlines, Inc.*, 406 F.Supp. 492 (N.D.Cal.1976). Yet plaintiffs would circumvent this process by having this Court ordain them as representatives of Wheeling's new employees. Such an action would usurp Wheeling's employees' right to select their own representatives free from improper employer or union influence. This, the Court cannot do. The Court cannot disrupt Congress' carefully crafted scheme for the selection of employee representatives.

In sum, Wheeling is not a "carrier" under the RLA and has no RLA "employees." The RLA, therefore, is inapplicable and plaintiffs cannot invoke its provisions to force Wheeling to comply with the bargaining requirements of the Act. Given that Wheeling is not a "carrier," and that applicants are not RLA "employees," Count I fails to state a claim for which relief can be granted and Wheeling's Rule 12 motion must be granted.

### 3. *Balance of the Harms*

Where, as here, there is no likelihood of success on the merits, the question of irreparable harm diminishes in importance. *North Carolina State Ports Auth. v. Dart Containerline Co.*, 592 F.2d 749, 750 (4th Cir.1979). Indeed, given the ruling on the

---

**14.** *Fall River Dyeing and Finishing Corp. v. National Labor Relations Board*, 482 U.S. 27, 43, 107 S.Ct. 2225, 2236, 96 L.Ed.2d 22 (1987). The *Fall River* doctrine embodies the notion that,

under the National Labor Relations Act, "successor" employers are obligated to bargain with predecessor's union.

dismissal motion, the Court need not reach the balance of harms, but does so in the interest of providing the parties with a complete record for appellate review.

■ Plaintiffs argue that they will suffer irreparable injury in the absence of injunctive relief. They contend that

"[d]efendant's hiring of employees before an agreement is reached with rail labor will effectively make it impossible to reach such an agreement later because [Wheeling] will have already made employment commitments to individuals, and those individuals will have altered their circumstances in reliance on those commitments."

They go on to state that

"[s]uch actions cannot be corrected later by negotiations, nor can the losses which would occur to the effected employees be readily measured or even compensated by an award of damages."

In sum, plaintiffs maintain that if defendant is permitted to hire employees out of seniority order, it will later be impossible for a Court to restore employees to their proper seniority.

This claim is not free from doubt. While it may be difficult, and perhaps even impossible, for a Court to re-order employee seniority once Wheeling hires non-N & W employees, this harm is neither clear nor certain. As noted above, Wheeling's proposed operations are vastly different from N & W's existing system. Thus, plaintiffs have not demonstrated that N & W's seniority system, even if imposed, would be applicable to the employees or effective in achieving their interests. Nor have plaintiffs demonstrated that Wheeling's seniority system is harmful to N & W employees. Beyond this, N & W employees possess substantial rights as N & W employees with respect to any acquisition or merger transaction. They do not have to relinquish their N & W employment in order to accept a position with Wheeling. Further, approximately sixty percent of N & W em-

ployees have property protections guaranteeing that, if there is no suitable Wheeling position available, they will receive their average monthly compensation for the rest of their working lives. And, N & W employees also have the opportunity of entering into a severance agreement with Wheeling whereby the employee accepts compensation in the amount of 360 times her or his daily rate of pay and is discharged. Thus, it cannot be said that plaintiffs will likely suffer irreparable harm without the TRO. The real harm to plaintiffs is that they are not being permitted to act as the bargaining representative for the employees, including N & W employees, seeking employment with Wheeling. The short answer to this is that the law does not confer that right of representation on plaintiffs.

Defendant, on the other hand, may suffer irreparable harm were the Court to grant the relief requested. Wheeling and N & W have proceeded toward consummation of this transaction involving the transfer of hundreds of miles of railroad property in three states. Notice of job abolishment have been given to affected N & W employees in accordance with governing N & W labor agreements. Wheeling has made significant financial investments, estimated at $300,000, in its preparation to begin railroad operations; and N & W has taken many steps to effectuate its withdrawal from the property. The lines' shippers will also be adversely affected by an injunction. Finally, if the Court were to grant the TRO until the dispute could be otherwise resolved, the delay would likely destroy the transaction's viability.[15] As noted at oral argument, it took approximately three years for a similar dispute to reach the Supreme Court for a final adjudication, by which time, changed economic conditions had doomed the transaction. *See Pittsburgh & Lake Erie R.R. v. Railway Labor Executives' Ass'n,* —— U.S. ——, 109 S.Ct. 2584, 105 L.Ed.2d 415 (1989). On balance, therefore, plaintiffs'

---

**15.** This fact is especially important in light of plaintiffs' delay in bringing this action. The Wheeling acquisition was announced more than four months prior to plaintiffs' filing this action.

Plaintiffs did not file the action until nearly two months after Wheeling declined to engage in bargaining with them over the selection of its initial work force.

request for a TRO must be denied; the balance of the harms favors defendant and plaintiffs have shown no likelihood of success on the merits.

### 4. *The Public Interest*

As the ICC concluded, the public interest is not served by enjoining the Wheeling transaction. Since February, 1990, Wheeling has expended substantial time, effort and resources in preparation for its assumption of the rail lines' operations. Prospective Wheeling employees have left previous employment, relocated their homes, and made other costly decisions in reliance on this transaction's consummation. And, as noted above, the shippers' interests in continuing their operations militate against hindering completion of this transaction. *See Railway Labor Executives' Ass'n v. Wheeling Acquisition Corp.,* ICC No. 31591 (April 30, 1990).

### *Conclusion*

After examining plaintiffs' application for a TRO in light of the *Blackwelder* factors, this Court concludes that (i) plaintiffs will not succeed on the merits; (ii) plaintiffs' harm does not outweigh defendant's; and (iii) the public interest will not be served by a TRO. Accordingly, as ordered by this Court on May 11, 1990, defendant's Motion to Dismiss Count I is GRANTED and plaintiffs' Application for a TRO is DENIED.