**RAILWAY LABOR EXECUTIVES' ASSOCIATION, et al., Plaintiffs,**

v.

**WHEELING & LAKE ERIE RAILWAY CO., Defendants,**

and

**Norfolk & Western Railway, et al., Intervenors.**

**Civ. A. No. 90–0597–A.**

United States District Court, E.D. Virginia, Alexandria Division.

July 11, 1990.

John O'B Clarke, Jr., Highshaw, Mahoney & Clarke, P.C., Vienna, Va., for plaintiffs.

Timothy A. Harr, Oppenheimer Wolff & Donnelly, Robert H. Wheeler, Washington, D.C., for defendants.

---

Jeffrey S. Berlin, Richardson Berlin & Morvillo, Washington, D.C., for Norfolk & Western Ry. Co.

## MEMORANDUM OPINION

ELLIS, District Judge.

This is the latest chapter in what may justly be called the Norfolk Southern System ("NS") spur line sale/lease saga. It is occasioned by the desire of the labor plaintiffs to put squarely in issue before the Fourth Circuit Court of Appeals the novel question whether the National Labor Relations Act's [1] ("NLRA") successorship doctrine [2] applies in the Railway Labor Act [3] ("RLA") context. Although the Court had previously indicated its view on this question, [4] the labor plaintiffs were concerned that the Fourth Circuit would not consider and decide the question because it was not properly part of the appeal. [5] To remedy this and remove any doubt, the labor plaintiffs have filed motions (1) to vacate and dissolve the preliminary injunction and (2) for leave to file an amended and supplemented complaint. For the reasons that follow, the Court concludes that the NLRA successorship doctrine does not operate in the RLA context and that both of labor plaintiffs' motions must, therefore, be denied.

### I.

The background facts of the spur line sale/lease saga are set forth in the opinions previously issued in this and a related case. *See Wheeling,* 736 F.Supp. 1397 (E.D.Va. 1990); *RLEA, et al. v. Chesapeake & Western Ry., et al.* (*"Chesapeake"*), 738 F.Supp. 1544 (E.D.Va.1990). For the purposes of this chapter of the saga, the following recapitulation is sufficient.

Wheeling and Lake Erie Ry. ("Wheeling"), formerly the Wheeling Acquisition Corp., acquired approximately 575 miles of rail lines from the Norfolk & Western Ry. ("NW"). The transaction also involved Wheeling's acquisition of trackage rights to an additional 264 miles of rail lines. The transaction was consummated on May 17, 1990. Approximately two weeks earlier, the labor plaintiffs had filed the complaint in this case seeking, *inter alia,* injunctive relief under the RLA to require Wheeling to bargain with the labor plaintiffs over the manner in which Wheeling would hire its new employees and the terms and conditions of their employment. Immediately following this filing, the labor plaintiffs sought a temporary restraining order and preliminary injunction to prevent Wheeling from hiring any employees until it negotiat-

---

**1.** 29 U.S.C. § 151 *et seq.*

**2.** This doctrine holds that in certain circumstances a successor employer may have a duty to bargain with the representative certified to the predecessor employer. *See Fall River Dyeing and Finishing Corp. v. NLRB ("Fall River"),* 482 U.S. 27, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987); *NLRB v. Burns Int'l Sec. Serv., Inc. ("Burns"),* 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972).

**3.** 45 U.S.C. § 151 *et seq.*

**4.** On two occasions from the bench and once in an earlier opinion in this case, the Court expressed its view that the NLRA successorship doctrine did not apply in the RLA context. *See* Transcript of Proceedings dated May 17, 1990 at 22; Transcript of Proceedings dated May 23, 1990 at 121; *RLEA, et al. v. Wheeling Acquisition Corp. ("Wheeling"),* 736 F.Supp. 1397 (E.D. Va.1990). Notwithstanding these earlier views, the Court has here reexamined the issue *de novo.*

**5.** This concern seems unfounded. In paragraph 9 of the preliminary injunction entered on May 23, 1990, the Court declared that,

> [t]he dispute between the unions and Wheeling is a "representation dispute" and is therefore subject to the exclusive procedure for the resolution of such disputes established by the RLA, and in particular by section 2 Ninth of the RLA, 45 U.S.C. § 152 Ninth. The National Mediation Board has exclusive jurisdiction with respect to representation disputes. Accordingly, the dispute between the unions and Wheeling is within the NMB's exclusive jurisdiction, and the RLA prohibits the unions from striking, or otherwise exercising coercive self-help, in an effort to resolve that dispute. The unions' threatened strike is therefore unlawful under the RLA because it is an attempt to circumvent the exclusive RLA mechanism for the resolution of representation disputes.

This declaration would seem, necessarily, to preclude the operation of the successorship doctrine. As noted, however, the Court has here reexamined the issue.

ed with labor plaintiffs over the manner in which the employees would be hired and assigned and the terms and conditions of their employment. The central question there presented was whether Wheeling was a "carrier" subject to the RLA given that it had contracted to purchase rail lines, but did not then own or operate any such lines. After hearing oral argument, the Court concluded, *inter alia*, that Wheeling was not a "carrier" under the RLA and therefore denied labor plaintiffs' request for injunctive relief. *See Wheeling*, 736 F.Supp. at 1400.

Once the transaction was consummated, Wheeling then became an owner and operator of rail lines and thus a "carrier" subject to the RLA. By then, Wheeling had also hired its complement of employees, more than one-half of whom are former NW or NS employees who previously had been represented by various of the labor plaintiffs. More specifically, it appears that of the 206 employees Wheeling has hired, 172 are former NW personnel who worked on the rail lines Wheeling acquired.[6] And labor plaintiffs further claim that of the approximately 75 personnel currently working at Wheeling performing maintenance of way work, 60 are former NW employees and members of the Brotherhood of Maintenance of Way Employees ("BMWE"). Similarly, labor plaintiffs claim that 10 of the 14 employees performing Wheeling's signal work are members of the Brotherhood of Railroad Signalmen from NW and 11 of the roughly 18 employees now doing Wheeling's carmen work are members of the Brotherhood of Railway Carmen Division of TCU who previously did the same work for NW on the lines acquired by Wheeling. In short, labor plaintiffs claim

that substantially more than one-half of Wheeling's employees are former NW employees who worked on the rail lines Wheeling acquired and who were then, and are now, represented by various of the labor plaintiffs.

Relying on this substantial continuity in the work force certain of the labor plaintiffs, after May 17, twice served RLA § 6 notices on Wheeling demanding recognition and commencement of bargaining. Wheeling has steadfastly declined, taking the position that RLA § 2 Ninth controls and establishes the procedure labor plaintiffs must follow to obtain certification as an RLA "representative." *See* 45 U.S.C. § 152 Ninth.[7]

Following the May 27 closing, the labor plaintiffs changed their position on the use of self-help. Up to that time, counsel for labor plaintiffs had represented to the Court that the unions would refrain from engaging in self-help measures and picketing. When this position changed, the labor plaintiffs promptly advised the Court and the parties that the unions intended to engage in recognition picketing at various sites, including certain interchange points between the NW and Wheeling lines. The likely practical effect of this picketing would be the shut-down of the interchange and widespread disruption of rail service. Faced with this prospect, NW, on May 23, 1990, successfully sought injunctive relief from this Court, chiefly on the ground that the contemplated coercive self-help was contrary to RLA § 2 Ninth and a circumvention of the RLA's compulsory procedures for the resolution of representation disputes.[8]

---

**6.** Labor plaintiffs claim this number climbs to 187 when former employees of other NS lines and furloughed NS employees are counted. It also appears that Wheeling may seek to hire an additional 64 employees, probably from non-NW sources. Even so, over 50% of Wheeling's total complement will have previously worked for NW on the lines Wheeling acquired.

**7.** Indeed, it appears that one of the unions is doing just that. BMWE has obtained authorization cards from various Wheeling employees and has applied to the National Mediation Board ("NMB") for an election.

**8.** The Court issued the preliminary injunction after hearing testimony and arguments, and receiving documentary evidence on May 17 and May 23, 1990. The preliminary injunction summarizes the Court's findings. *See also* Transcript of Proceedings dated May 23, 1990. In essence, the Court concluded that the contemplated self-help was an attempt to force the resolution of a representation dispute in violation of RLA § 2 Ninth. *See* Preliminary Injunction, para. 9, *supra* at note 5. *See also Summit Airlines, Inc. v. Teamsters Local Union No. 295* ("*Summit*"), 628 F.2d 787, 788, 794–95 (2d Cir.

**598**

## II.

■ Labor plaintiffs' invitation to import the NLRA successorship doctrine into the RLA context is not wholly without appeal. At first blush, it seems sensible to impose on a successor employer a duty to bargain with a predecessor's union where that employer has hired a substantial and representative complement of its employees and it is "perfectly clear" that the majority requirement is met. *See Fall River*, 482 U.S. at 45–51, 107 S.Ct. at 2237–40.[9] But closer scrutiny compels the conclusion that the invitation must be declined. To begin with, the RLA and NLRA schemes are not animated by the same balance of policy considerations. The RLA was enacted "to prevent, if possible, wasteful strikes and interruptions in interstate commerce." *Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union*, 396 U.S. 142, 148, 90 S.Ct. 294, 298, 24 L.Ed.2d 325 (1969) (footnote omitted). By contrast, the NLRA takes a different approach, proscribing strikes and picketing only in specific circumstances, but otherwise recognizing the right to strike and engage in self-help. *See* 29 U.S.C. § 163 ("Nothing in this subchapter, except as specifically provided for herein, shall be construed so as either to interfere with or impede or diminish in any way the right to strike, or to affect the limitations or qualifications on that right"); 29 U.S.C. § 158(b) (specifically prohibiting particular types of picketing); *NLRB v. Drivers, Chauffeurs, Helpers, Local Union*

*No. 639*, 362 U.S. 274, 284, 80 S.Ct. 706, 712, 4 L.Ed.2d 710 (1960) (discussing 29 U.S.C. § 158(b) and stating that it represents Congress's decision to deal with certain "isolated evils" in the area of picketing). This difference between the RLA and NLRA was recognized by the Second Circuit in *Summit*, 628 F.2d at 794. There, the court stated: "Unlike the National Labor Relations Act, the Railway Labor Act is specifically designed and intended '[t]o avoid any interruption to commerce or to the operation of any carrier engaged therein....' 45 U.S.C. § 151a." (citations omitted).

■ The RLA's overarching purpose of avoiding strikes and coercive self-help is reflected in the comprehensiveness of the RLA scheme. The RLA obligates a carrier to bargain with the chosen representative of a majority of a "craft or class" of employees. 45 U.S.C. § 152 Fourth. And, RLA § 2 Third, 45 U.S.C. § 152 Third, guarantees that employees will have an unfettered right to select their collective bargaining representative, free from all interference. Significantly, the sole and exclusive process for selection of employee representatives is set forth in RLA § 2 Ninth, 45 U.S.C. § 152 Ninth.[10] That section confers discretion on the NMB to define appropriate crafts or classes and to resolve all disputes concerning representation. Also within the NMB's discretion is the choice of a procedure for selection of a

1980) (union may not resort to picketing, or other forms of self-help, in attempt to force resolution of a representation dispute). And, any doubt as to whether the focus of the picketing and self-help measures was a representation dispute should be resolved in favor of finding that it is. *See Air Line Pilots Ass'n, Int'l v. Texas Int'l Airlines, Inc.* (*"Texas Int'l"*), 656 F.2d 16, 24 (2d Cir.1981) (citing *Summit*, 628 F.2d at 793); *IUFA v. Pan American World Airways, Inc.* (*"Pan Am"*), 664 F.Supp. 156, 160 (S.D.N.Y.1987) *aff'd*, 836 F.2d 130 (2d Cir.1988).

Worth noting, too, is that threatened coercive action against Wheeling also arguably circumvents the principle established in *Pittsburgh & Lake Erie v. RLEA*, — U.S. —, 109 S.Ct. 2584, 105 L.Ed.2d 415 (1989), that a railroad is not required to bargain over an issue of a line sale, but only over the sale's "effects" on employees. NW has apparently negotiated an "effects"

agreement with the Brotherhood of Locomotive Engineers in connection with the Wheeling transaction. Further, NW advises the Court that it is continuing to engage in "effects" bargaining with the other plaintiff unions under the auspices of the NMB.

9. Some uncertainty remains concerning whether the work force continuity is to be measured within appropriate bargaining units or across the work force as a whole. *See Fall River*, 482 U.S. at 47 n. 12, 107 S.Ct. 2237 n. 12 (1987).

10. Congress added this section to the RLA "as a device to strengthen and make more effective the processes of collective bargaining." *Switchmen's Union of North America v. NMB* (*"Switchmen"*), 320 U.S. 297, 302, 64 S.Ct. 95, 97, 88 L.Ed. 61 (1943).

bargaining representative.[11] Finally, the NMB's jurisdiction over representation disputes is plenary and exclusive, *General Committee of Adjustment of Bhd. of Locomotive Eng'rs v. Missouri–Kansas–Texas R.R.*, 320 U.S. 323, 336, 64 S.Ct. 146, 152, 88 L.Ed. 76 (1943); *Order of R.R. Telegraphers v. Leighty*, 298 F.2d 17, 19 (4th Cir.), *cert. denied*, 369 U.S. 885, 82 S.Ct. 1160, 8 L.Ed.2d 287 (1962),[12] and the RLA § 2 Ninth procedure is mandatory. *See Summit*, 628 F.2d at 795. In sum, by enacting this comprehensive RLA scheme and by creating the NMB and granting it exclusive power over representation disputes, Congress has deliberately left no room for courts to engraft a successorship doctrine onto the RLA. Indeed, it is plain that such a doctrine, even assuming it were to fit the facts at bar[13], is incompatible with the mandatory RLA § 2 Ninth procedure and the NMB's exclusive jurisdiction over representation disputes. To hold otherwise would have this Court decide what is the appropriate craft or class[14] and who is, or are, the authorized bargaining representative(s). But Congress has committed these decisions exclusively to the NMB. It follows, then, that to import a successorship doctrine into the RLA context would wrongly have this Court usurp functions Congress committed solely to the NMB.

There is apparently no published judicial decision squarely deciding whether the successorship doctrine applies in the RLA context. There are, however, several decisions with persuasive force here as they illustrate the scope and compulsory nature of RLA § 2 Ninth procedures and the NMB's exclusive jurisdiction over RLA representation disputes.[15] This is such a dispute;[16] it belongs before the NMB. Moreover, in declining the invitation to fashion an RLA successorship doctrine, this Court is acting in conformity with the Interstate Commerce Commission ("ICC") which, it appears, also declined the same invitation. *See Wheeling*, 736 F.Supp. at 1403–04, cit-

---

**11.** The NMB's current procedures are found in 29 C.F.R. Part 1206.

**12.** Except for constitutional violations or gross violations of RLA commands, NMB representation determinations are not judicially reviewable. *See Brotherhood of Ry & S.S. Clerks v. Association for the Benefit of Noncontract Employees*, 380 U.S. 650, 658–60, 85 S.Ct. 1192, 1196–97, 14 L.Ed.2d 133 (1965); *Order of Ry. Conductors v. Pennsylvania R.R. Co.*, 323 U.S. 166, 65 S.Ct. 222, 89 L.Ed. 154 (1944); *Switchmen's*, 320 U.S. at 303, 64 S.Ct. at 98.

**13.** Labor plaintiffs sought to compel Wheeling to engage in prehiring bargaining. Neither *Burns*, nor *Fall River* supports such an obligation in the NLRA context. Arguably, the NLRA successorship doctrine extends only to the terms and conditions of the successor's work, not to who the successor employer may hire or what hiring criteria it should use. Indeed, under the NLRA, it is settled that the successor employee is free to select its own work force, provided it does not act in a discriminatory manner. *See Howard Johnson Co., Inc. v. Detroit Local Joint Exec. Bd., Hotel & Restaurant Employees*, 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974). Thus, in seeking prehiring bargaining under the RLA, labor plaintiffs sought more rights than are available under the NLRA. Yet, the cases recognize that the NLRA provides job applicants with greater rights than the RLA. *See Air Line Pilots Ass'n Int'l v. United Air Lines, Inc.*, 802 F.2d 886, 914–15 (7th Cir.1986); *Nelson v. Piedmont Avia-*

tion, Inc., 750 F.2d 1234, 1236–37 (4th Cir.1984), *cert. denied*, 471 U.S. 1116, 105 S.Ct. 2358, 86 L.Ed.2d 259 (1985).

**14.** Labor plaintiffs argued that crafts and classes have long been fixed and established in the railroad industry and thus no judicial determination would be required in this regard. This argument overlooks the possibility, if not likelihood, that Wheeling will reorganize its work in an effort to achieve greater efficiency and the NMB's discretion to change crafts and classes when it deems it appropriate. This flexibility is an important part of the RLA scheme.

**15.** *See, e.g., Flight Eng'rs Int'l Ass'n v. Pan American World Airways, Inc.*, 896 F.2d 672, 673 (2d Cir.), *cert. denied*, ––– U.S. –––, 110 S.Ct. 2220, 109 L.Ed.2d 545 (1990); *International Bhd. of Teamsters v. Texas Int'l Airlines, Inc.* ("*Teamsters*"), 717 F.2d 157, 158 (5th Cir.1983); *Summit*, 628 F.2d at 788, 794–95; *Pan Am*, 664 F.Supp. at 160.

**16.** Representation disputes may involve rival unions or, as here, situations where only one union seeks to represent a craft or class. In this latter event, the dispute is deemed to exist between employees who favor the union on the one hand and those opposed or indifferent on the other. *See Western Airlines, Inc. v. International Bhd. of Teamsters*, 480 U.S. 1301, 107 S.Ct. 1515, 1516–17, 94 L.Ed.2d 744 (1987); *Teamsters*, 717 F.2d at 163; *Summit*, 628 F.2d at 795 n. 4.

ing and quoting from *RLEA v. Wheeling Acquisition Corp.*, ICC No. 31591 (April 30, 1990).

Labor plaintiffs claim that two decisions, *In re Chicago, Milwaukee, St. Paul & Pacific R.R.* ("*Chicago, Milwaukee*"), 658 F.2d 1149 (7th Cir.1981), *cert. denied*, 455 U.S. 1000, 102 S.Ct. 1632, 71 L.Ed.2d 867 (1982), and *Brotherhood of Railway, Airline & S.S. Clerks v. REA Express, Inc.* ("*REA Express*"), 523 F.2d 164 (2d Cir.) *cert. denied*, 423 U.S. 1017, 96 S.Ct. 451, 46 L.Ed.2d 388 (1975), implicitly approve a successorship doctrine in the RLA context. Closely read, neither decision supports this claim. In *Chicago, Milwaukee*, the Seventh Circuit did not apply the NLRA successorship doctrine or hold that the doctrine should be applied in the RLA context to require recognition and bargaining by successor employers. Rather, that court, citing NLRA successorship cases, affirmed the refusal of the bankruptcy court to impose the substantive terms of a bankrupt railroad's collective bargaining agreements upon the non-carrier entities acquiring the railroad. The court merely recognized that the NLRA policies militating against forcing new, non-consenting employers to accept the terms of their predecessor's collective bargaining agreements applied with equal force in the RLA context. 658 F.2d at 1174–75. By no means is this a holding, either explicit or implicit, that the doctrine applies in the RLA context. The *REA Express* decision is equally inapposite. There, the court noted that a bankrupt carrier that continues as a debtor in possession must bargain with the employees' representative. But, the court went on to note, citing *Burns*, that the debtor in possession has no obligation to refrain from changing the terms of the agreement subject to the RLA's provisions. 523 F.2d at 170. Again, this decision, like the *Chicago, Milwaukee* decision, cannot fairly be read to approve the importation of the NLRA successorship doctrine into the RLA scheme.

In summary, RLA § 2 Ninth and the NMB's exclusive jurisdiction over representation disputes compel the result reached. But to see the issue only in these terms is to miss an important point. By advocating

application of an RLA successorship doctrine, labor plaintiffs in essence advocate the more far-reaching principle that bargaining rights run with the rail property rather than derive from compliance with RLA § 2 Ninth procedures. In rejecting an RLA successorship doctrine, the Court also rejects this principle. Here again, the Court's conclusion is in harmony with that of the ICC, which in *Wilmington Terminal Railroad, Inc.—Purchase and Lease—CSX Transportation, Inc.*, 6 I.C. C.2d 799 (dated June 20, 1990; served June 28, 1990), stated that,

> [i]n line sale cases such as this one, there is no privity of contract (due to lack of any employment relationship) between the seller's employees and the buyer to support the right of seller's employees to bargain with the buyer concerning the impacts of the transaction. *In legal terms, bargaining rights do not 'run with the rail property,' but flow, if at all, from the contractual relationship between labor and management.*

(emphasis added). In this case, no bargaining rights encumber or run with the property Wheeling acquired. If labor plaintiffs are to gain such rights they must proceed by following RLA § 2 Ninth and making an appropriate submission to the NMB.

Because the successorship doctrine has no application here, there are no new circumstances that justify vacating or dissolving the preliminary injunction. Labor plaintiffs' motion in this regard must, therefore, be denied.

### III.

Given the Court's conclusion that the NLRA successorship doctrine does not apply here, it follows that the amendment to the complaint offered by labor plaintiffs fails to state a claim upon which relief can be granted. *See* Rule 12(b)(6), Fed.R.Civ.P. Because the proffered amendment is insufficient on its face, it further follows that leave to amend should be denied as futile. *See Glick v. Koenig*, 766 F.2d 265, 268–69 (7th Cir.1985); *Buder v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 644 F.2d 690, 695 (8th Cir.1981); *Davis v. Piper*

*Aircraft Corp.*, 615 F.2d 606, 613 (4th Cir.), *cert. denied*, 448 U.S. 911, 101 S.Ct. 25, 65 L.Ed.2d 1141 (1980). But denial of leave to amend does not impair labor plaintiffs' right, if any, to appeal the successorship doctrine question. The question has been squarely presented and decided here both in the context of the preliminary injunction and in the context of the two motions at bar.

An appropriate order will issue. The Clerk is directed to issue copies of this Memorandum Opinion and the related order to all counsel of record.